# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3137

_____

Brian Iverson

*Plaintiff - Appellant*

v.

United States of America; Transportation Security Administration

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 15, 2019
Filed: August 31, 2020

_____

Before SMITH, Chief Judge, GRUENDER and BENTON, Circuit Judges.

_____

SMITH, Chief Judge.

The Federal Tort Claims Act (FTCA) waives sovereign immunity, allowing individuals to sue the United States for certain harms caused by its agents. For some torts, the FTCA specifies that an individual may only sue if the tort is committed by a specific class of government officer. This case involves a battery claim. Pursuant to the FTCA, a battery claim can proceed if an *investigative or law enforcement*

*officer* committed it. 28 U.S.C. § 2680(h). The central question here is whether Transportation Security Administration (TSA) screening personnel, known as Transportation Security Officers (TSOs), satisfy the FTCA's definition of an *investigative or law enforcement officer*. Holding that they do, we reverse and remand.

## I. *Background*

Generally, sovereign immunity prevents "the United States [from being] sued without its consent." *Hinsely v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 671 (8th Cir. 2008). When it passed the FTCA, Congress "remove[d] the sovereign immunity of the United States from suits in tort." *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (internal quotation omitted). "The Act gives federal district courts exclusive jurisdiction over claims against the United States for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment.'" *Id.* (quoting 28 U.S.C. § 1346(b)(1)). Congress's waiver of sovereign immunity, however, "is subject to a number of exceptions set forth in § 2680." *Id.*

Specifically, Congress excepted certain intentional torts from the statutory waiver of sovereign immunity. This exception bars "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Thus, claims for these acts remain barred by sovereign immunity. To complicate matters, however, the statute also contains an exception to the exception. The "law-enforcement proviso" allows plaintiffs to file claims arising "out of assault, battery, false imprisonment, false arrest, abuse of process, [and] malicious prosecution." *Id.* The proviso only applies, however, to claims that are the result of "acts or omissions of *investigative or law enforcement officers* of the United States Government." *Id.* (emphasis added). The proviso defines *investigative or law enforcement officer* as "any officer of the United States who is empowered by law to

execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* In sum, a plaintiff may sue the United States for injuries resulting from assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, if committed by an investigative or law enforcement officer.

In this case, Brian Iverson went through security at the Minneapolis-St. Paul airport. Because of a prior injury, Iverson walked with the aid of crutches. At the security checkpoint, TSOs performed a pat-down search. During that search, Iverson was allowed to place his hands on his crutches but had to stand on his own power. Iverson alleges that a TSO pulled him forward and then abruptly let go, causing Iverson to fall. The fall injured Iverson.

Iverson filed an administrative claim, which the TSA denied. He then filed this suit, asserting battery and negligence claims. The government moved to dismiss, arguing that the FTCA's waiver of sovereign immunity does not cover intentional torts, such as battery. It also asserted that the FTCA bars claims that arise out of an intentional tort, such as Iverson's negligence claim. Iverson argued that TSOs are *investigative or law enforcement officers* under the proviso, and thus they are not immune from suit. In the alternative, he argued that his negligence claim did not arise out of his battery claim. After finding for the government, the district court dismissed Iverson's complaint. This appeal followed.

## II. *Discussion*

Iverson contends that TSOs are *investigative or law enforcement officers* under the proviso. *See* 28 U.S.C. § 2680(h). Therefore, he claims, the district court erred in finding that they are immune from suit. We review the district court's grant of a motion to dismiss de novo. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 933 n.4 (8th Cir. 2012). In our review, we "accept[] all factual allegations in the complaint as true and draw[] all inferences in favor of the nonmovant." *Id.*

Are TSOs *investigative or law enforcement officers* under the law-enforcement proviso of the FTCA? *See* 28 U.S.C. § 2680(h). We begin with the statute's text. The statute defines those officers as "*any officer of the United States* who is *empowered by law* to *execute searches*, to seize evidence, or to make arrests for violations of Federal law." *Id.* (emphasis added).

The parties disagree about the meaning of the emphasized terms. Iverson contends a plain reading of the statute shows that TSOs are *officers* who are *empowered by law* to *execute searches*. The government disagrees and avers that the proviso refers only to "traditional" law enforcement activities, not to the work of the uniformed employees screening passengers at airports. Appellee's Br. at 17, 21–22. Thus, it claims, TSOs are not legally empowered to do those acts excepted from sovereign immunity's bar under any reading of the statue.

"When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). But "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *United States v. Jungers*, 702 F.3d 1066, 1071 (8th Cir. 2013) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). We have stated that "[o]rdinarily, a word's usage accords with its dictionary definition." *Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 (8th Cir. 2018) (quoting *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015)).

While interpreting another provision of § 2680, the Supreme Court has instructed that "[t]he definition[s] of words in insolation . . . [are] not necessarily controlling in statutory construction." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). "A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Id.*

-4-

Whether TSOs satisfy the law-enforcement proviso is a new issue for this court. Two of our sister circuits have addressed it but are divided on the answer. *See generally Pellegrino v. U.S. Trans. Sec. Admin.*, 937 F.3d 164, 180 (3d Cir. 2019) (en banc) (finding that TSOs constitute *investigative or law enforcement officers*); *Corbett v. Trans. Sec. Admin.*, 568 F. App'x 690, 701 (11th Cir. 2014) (per curiam) (finding that TSOs do not constitute *investigative or law enforcement officers*). Most recently, the Third Circuit, sitting en banc, found that TSOs satisfy the proviso's definition. *See Pellegrino*, 937 F.3d at 180.[1] These decisions provide persuasive authority only. *See Jaben v. United States*, 333 F.2d 535, 538 (8th Cir. 1964).

We first address each term and the parties' relevant arguments separately, but will bear in mind that when interpreting the statute, we consider "the whole statutory text." *Dolan*, 546 U.S. at 486.

### A. *Officers*

To qualify as an *investigative or law enforcement officer* under the proviso, a TSO must be "any *officer* of the United States." 28 U.S.C. § 2680(h) (emphasis added). The parties disagree about the definition of *officer*. Because the term is not statutorily defined, we consider its ordinary dictionary definition. *See Thompson Truck & Trailer*, 901 F.3d at 953.

Congress enacted the proviso in 1974. One dictionary from the time defines *officer* as "one charged with a duty" and "one who is appointed or elected to serve in a position of trust, authority, or command esp. as specif. provided for by law." *Officer*, Webster's Third New Int'l Dictionary (1971). Another defines *officer* as "[o]ne who is charged by a superior power (and particularly by government) with the

---

[1] When it considered this question, the district court relied on the earlier panel decision, which the Third Circuit reversed en banc. *See Pellegrino v. U.S. Transp. Sec. Admin.*, 896 F.3d 207 (3d Cir. 2018), *vacated*, 904 F.3d 329 (3d Cir.).

power and duty of exercising certain functions" or "[o]ne who is invested with some portion of the functions of the government to be exercised for the public benefit." *Officer*, Black's Law Dictionary (4th ed., rev. 1968).

Applying those definitions, the *Pellegrino* majority found that TSOs are *officers. See* 937 F.3d at 170–72. These individuals are tasked with government functions, specifically, carrying out safety screenings at airports. *Id.* at 170. And, they perform those functions for the public's benefit. *Id.* It also noted that the TSA itself calls TSOs *officers*, and that "TSOs wear uniforms with badges that prominently display the title." *Id.*

We also conclude that TSOs are officers. They are "charged with a duty," *Officer*, Webster's Third New Int'l Dictionary (1971), and "charged by a superior power . . . with the power and duty of exercising certain functions." *Officer*, Black's Law Dictionary (4th ed., rev. 1968). Congress, by statute, charged TSOs with the power to conduct airport screenings. *See* 49 U.S.C. § 44901.

Those screenings are a " function[] of the government . . . exercised for the public benefit." *Officer*, Black's Law Dictionary (4th ed., rev. 1968). Specifically, the screenings ensure that no passenger enters a plane with a prohibited item, including "weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5 (defining "Screening function"). This function protects passenger safety and national security.

Further, TSOs "serve in a position of . . . authority." *Officer*, Webster's Third New Int'l Dictionary (1971). The TSA holds them out to the public as officers through their title and uniforms. It does so to ensure the public respects them.[2]

---

[2]TSA stated that it altered TSOs' uniforms, including adding badges, to "address[] officers' concerns of utility, respect, and confidence, and will stand as a readily identifiable symbol of TSA's security mission and officers' role of keeping

Agreeing with the *Pellegrino* dissent, *see* 937 F.3d at 189–94 (Krause, J., dissenting), the government argues that more specific definitions should apply. For example, the government argues that we should adopt a recent dictionary definition of *United States Officer*, which is defined as "an officer appointed under the authority of the federal government." Appellee's Br. at 12 (quoting *United States officer*, Black's Law Dictionary (10th ed. 2014)). Even applying that definition, the analysis would be unchanged.

Additionally, Iverson's definitions better reflect the ordinary meaning of *officers* in the proviso. First, the use of the term *any* before *officers* does not favor a narrow definition to those who are classified as appointed. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting Webster's Third New Int'l Dictionary 97 (1976)). Second, Iverson's definition comes from dictionaries that are contemporaries of the proviso, while the government favors newer dictionaries. Our task is to find the word's "ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up). Webster's Third New International and Black's Revised Fourth Edition are the more helpful references.

---

the traveling public safe." *Press Release, Transportation Security Officers Have Renewed Focus and New Look on Seventh Anniversary of 9/11*, Transp. Sec. Admin. (Sept. 11, 2008), https://www.tsa.gov/news/releases/2008/09/11/transportation-security-officers-have-renewed-focus-and-new-look-seventh. "The attire aims to convey an image of authority to passengers, who have harassed, pushed and in a few instances punched screeners. 'Some of our officers aren't respected,' TSA spokeswoman Ellen Howe said." Thomas Frank, *TSA's New Policelike Badges a Sore Point with Real Cops*, ABC News (June 23, 2008), https://abcnews.go.com/Travel/story?id=5173231&page=1.

As a consequence, we find that TSOs fall within the ordinary meaning of the proviso. But the government also argues that statutory contexts, both within and outside of the FTCA, counsel that we should depart from the plain meaning. We address those arguments, aware of the Court's directive that "[t]he case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." *Bouie v. City of Columbia*, 378 U.S. 347, 362–63 (1964) (quoting *United States v. Wiltberger*, 18 U.S. 76, 96 (1820) (Marshall, C.J.)).

The government first argues that TSOs are not *officers* under the FTCA because Congress identified them in a different Act as *employees*. The Airport Transportation Security Act (ATSA) directs that "screening . . . shall be carried out by a Federal Government *employee*." 49 U.S.C. § 44901(a) (emphasis added). The ATSA indicates, via cross reference, that an *employee* is "an officer and an individual." 5 U.S.C. § 2105(a).

Put another way, the government argues that Congress would have described TSOs as *officers* in the ATSA if it wanted courts to consider TSOs *officers* in the FTCA. We decline the invitation to disregard the FTCA's ordinary meaning and instead import Congress's classification of TSOs as *employees* from the ATSA. To be sure, Congress described TSOs as *employees* in the ATSA, but it also defined *employees* in ATSA to include *officers*. *See* 49 U.S.C. § 44901(a) (cross-referencing 5 U.S.C. § 2105 (defining *employee* as "an officer and an individual")). Consequently, it appears that Congress did not intend to exclude *officers* when using the term *employee* to describe screening personnel. Its choice to not cross-reference Title V's definition of *officer* does not alter that analysis; Congress simply chose a more inclusive term.

Second, the government's argument has an unacceptable statutory effect: It uses a later enactment—the ATSA—to limit the scope of an earlier enactment—the FTCA proviso. As it stands, the proviso, passed in 1974, covers TSOs because they satisfy the ordinary meaning of *officers*. If we were to import Congress's classification of TSOs from the ATSA, which was passed in 2001, with the interpretation the government prefers, TSOs would not be *officers* but mere employees. That would limit the earlier enactment's scope and alter its definition of *officers*. In short, this would require us to hold that Congress silently altered a term's meaning in one statute by passing an unrelated statute almost 30 years later. Such a holding would be contrary to principles of statutory interpretation. *See Bilski v. Kappos*, 561 U.S. 593, 607 (2010) ("Section 273's definition of 'method,' to be sure, cannot change the meaning of a prior-enacted statute."); *Patel v. Napolitano*, 706 F.3d 370, 376 (4th Cir. 2013) ("[T]he meaning of words in a statute cannot change with the statute's application." (alteration in original) (quoting *United States v. Santos*, 553 U.S. 507, 522 (2008)); *In re Roser*, 613 F.3d 1240, 1247 (10th Cir. 2010) ("[A] later legislature cannot change the meaning of a statute; it can only amend the statute.").

Admittedly, courts "do[] not lightly assume that Congress silently attaches different meanings to the same term *in the same or related statutes*." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) (emphasis added). Relying on this language, the dissent in *Pellegrino* argued that the ATSA "mapped" itself into the FTCA. 937 F.3d at 191–92 (Krause, J., dissenting). But that analysis skipped a key part of the inquiry: Whether the statutes are "the same or related." *Azar*, 139 S. Ct. at 1812.

The FTCA and ATSA are certainly not the same statute. Nor does the government argue that they are materially related. Indeed, a relevant statutory canon requires that the statutes be *in pari materia* ("on the same subject") before courts can

construe them "as if they were one law." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (internal quotation omitted); *see also United States v. Stewart*, 311 U.S. 60, 64 (1940) ("That these two acts are in pari materia is plain. Both deal with precisely the same subject matter, viz., the scope of the tax exemption afforded farm loan bonds. The later act can therefore be regarded as a legislative interpretation of the earlier act . . . ."). The FTCA and ATSA are not on the same subject. The former deals with federal sovereign immunity while the latter deals with traveler safety. Therefore, there is no reason to assume that Congress attached the same meanings to *employee* and *officer* in each. Nor is there reason to believe that Congress was attempting to avoid waiving sovereign immunity when it classified TSOs as *employees*. In sum, there is little to be gained from ATSA's use of *employee* when analyzing the FTCA's definition of *officers*; TSO's status as an employee under the ATSA does not prevent them from being an *officer*.

The government argues that interpreting *officers* to cover TSOs renders the FTCA's use of *employee* redundant. Even if TSOs satisfied the definition of *employee* and *officer* in the FTCA, it does not mean that the terms are redundant. Similar to the ATSA, the FTCA's definition of *employee* includes *officers*. 28 U.S.C. § 2671. Thus the statute itself contemplates that an *officer* might also be an *employee*. In that instance, "[w]e are hesitant to put too much stock into a distinction between two terms that are not themselves mutually exclusive." *Pellegrino*, 937 F.3d at 171.

In summary, the phrase "any *officer* of the United States," as written in 28 U.S.C. § 2680(h), includes TSOs.

B. *Empowered by Law*

The government next argues that, even if TSOs are *officers*, they are not *empowered by law*. It asks this court, when evaluating if an actor is *empowered by law*, to "look to whether there is a specific statutory grant of authority to search, seize,

or arrest." Appellee's Br. at 18. That standard appears consistent with the ordinary meaning of *empowered*. Dictionaries from the time of the proviso's enactment defined *empower* as "to give official authority to" or to "delegate legal power to." *Empower*, Webster's Third New Int'l Dictionary (1971).

Under that definition, TSOs are *empowered by law* to execute searches. Through the ATSA, Congress requires the Administrator of the TSA (the "Administrator") to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft." 49 U.S.C. § 44901(a). Congress also required that those screenings "be carried out by a Federal Government employee"—the TSOs. *Id.* The ATSA indicates that those screenings can include various electronic means, canine detection teams, and "a physical search . . . with manifest verification." *Id.* § 44901(g)(4). Congress thus mandated that TSOs carry out screenings and authorized physical searches as one means to complete that duty. The statute specifically authorizes federal employees, TSOs, to screen passengers and property. We consider this sufficient to conclude that they are empowered by law to conduct searches.

The government argues that delegation does not constitute *empowerment* for two reasons. First, it argues that the ATSA delegates the authority to search to the Administrator—not to the TSOs. That argument is contrary to the statutory language. Section 44901(a) indicates that the Administrator "shall *provide* for the screening of all passengers." 49 U.S.C. § 44901(a) (emphasis added). Yet it specifies that "the screening . . . shall be *carried out* by [TSOs]." *Id.* (emphasis added). Congress requires that the Administrator *provide* the screening, and that TSOs *carry out* the screening. The party *providing* for the screening "make[s] provision" to ensure that it is conducted. *Provide*, Oxford English Dictionary (3d ed. 2007). But the party *carrying out* the screening must have the authority to put the screening "into practice" and bring it "to completion." *Carry Out*, Oxford English Dictionary (3d ed. 2007).

Because it is during the execution of the screening that the power to search is exercised, Congress necessarily empowered TSOs to effectuate searches.

Second, the government urges that the statutory authorization is limited and non-discretionary. We disagree. Congress gave TSOs discretion. The ATSA did not direct TSOs to "physically search" all passengers or cargo. Instead, it indicated that they could also use "x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams . . . . [and] additional methods." 49 U.S.C. § 44901(g)(4). Therefore, TSOs have discretion in exercising their authority to search passengers and property.

Thus, we conclude TSOs are "*empowered by law* to execute searches." 28 U.S.C. § 2680(h) (emphasis added).

### C. *To Execute Searches for Violations of Federal Law*

The government also maintains that TSOs do not "execute *searches . . .* for violations of Federal law." 28 U.S.C. § 2680(h) (emphasis added). This belies the ordinary meaning of *search*. Webster's defines *search* as "to look into or over carefully or thoroughly in an effort to find or discover." *Search*, Webster's Third New Int'l Dictionary (1971). Black's indicates that it means "[a]n examination of a man's . . . person, with a view to the discovery of contraband or illicit or stolen property." *Search*, Black's Law Dictionary (4th ed., rev. 1968).

By statute and practice, TSOs satisfy these definitions. TSOs are tasked with executing screenings "of all passengers and property." 49 U.S.C. § 44901(a). Those screenings include "a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security." *Id.* § 44901(g)(4). TSOs are empowered to use "x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams certified by the Transportation Security

Administration, or a physical search." *Id.* Accordingly, while screening, TSOs "look into or over" passengers and their property "carefully . . . in an effort to find or discover" "contraband or illicit . . . property." *Search*, Webster's Third New Int'l Dictionary (1971); *Search*, Black's Law Dictionary (4th ed., rev. 1968). Therefore, the screenings satisfy *search*'s ordinary meaning.

The same is true for TSOs' practices. TSOs use "[m]illimeter wave advanced imaging technology," which "safely screens passengers . . . for metallic and non-metallic threats, including weapons and explosives, which may be concealed under clothing." *Security Screening*, Trans. Sec. Admin., https://www.tsa.gov/travel/security-screening (select "Screening Technology" tab) (last visited March 25, 2020). They may also conduct "[p]at-down procedures," which include "inspection[s] of the head, neck, arms, torso, legs, and feet." *Id.* (select "Pat-Down Screening" tab). Those "are used to determine whether prohibited items or other threats to transportation security are concealed on the person." *Id.* These methods allow TSOs to look over passengers "carefully . . . in an effort to find or discover" "contraband or illicit . . . property." *Search*, Webster's Third New Int'l Dictionary (1971); *Search*, Black's Law Dictionary (4th ed., rev. 1968). We hold that TSOs conduct *searches*.

The government argues that (1) the proviso's use of *execute searches* refers to traditional law enforcement searches, and therefore, (2) TSOs' *administrative searches* do not satisfy the proviso.

The textual indicium that supports the government's first argument is that *execute searches* is followed by "seize evidence, or . . . make arrest." 28 U.S.C. § 2680(h). The powers referred to, it argues, are *traditional law enforcement* activities, so the *searches* referred to are only *traditional law enforcement searches*. The interpretative canon of *noscitur a sociis* undergirds that argument. That canon

"counsels lawyers reading statutes that a word may be known by the company it keeps." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010) (internal quotations omitted). Put another way, a word's meaning is ascertained "from the words around it." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (internal quotations omitted). Because *execute searches* is followed by seize evidence or make arrest, *execute searches*' meaning, the argument goes, is limited by those terms. Since those terms refer to traditional police powers, the government urges *searches* does as well.

The *Pellegrino* majority rejected the same argument. *See* 937 F.3d at 174–75. Two of its rationales for doing so are particularly persuasive. *Id.* First, because the term *searches* is clear, the court was hesitant to apply the canons. *Id.* at 174 (citing *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923) ("'Noscitur a sociis' is a well-established and useful rule of construction, where words are of obscure or doubtful meaning, and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words.")). Second, "the three duties in the proviso are listed in the disjunctive," where "the canon often is of little help." *Id.* at 174–75 (internal quotations omitted).

We agree with that analysis. *Noscitur a sociis* may only be used "where words are of obscure or doubtful meaning." *Russell Motor Car Co.*, 261 U.S. at 520. *Searches* is neither an obscure word nor is its meaning doubtful. In addition, the canon is not "particularly illuminating" where there is "[a] list of three items, each quite distinct from the other." *Graham Cty.*, 559 U.S. at 288. That is especially so where that list is joined by the disjunctive "or." *See id.* Therefore, we believe that the terms in the list need not modify each other.

Even if the terms do limit each other and *execute searches* in the proviso has a law enforcement connotation, TSOs satisfy that definition. The ordinary meaning

of *search* remains broad, even if limited to a criminal investigation context. Under a heading indicating that it is discussing "Criminal Law," Black's defines a *search* as "[a]n examination of a man's . . . person, with a view to the discovery of contraband or illicit or stolen property." *Search*, Black's Law Dictionary (4th ed., rev. 1968). As discussed above, TSOs are given the power to execute physical searches, such as pat downs, with the intent of finding weapons, explosives, or other prohibited items. So even in the criminal context, TSOs' screenings constitute *searches.*

For those reasons, TSOs *execute searches*, as required by the proviso. Therefore, we conclude they are contemplated within the meaning of the phrase "any officer . . . empowered by law to execute searches."[3] 28 U.S.C. § 2680(h). In consequence, TSOs satisfy the proviso's definition of an *investigative or law enforcement officer.*

### D. *Proviso as a Whole*

Reading the proviso as a whole does not alter our analysis. Its full text provides the following:

> [W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h).

---

[3]In its brief, the government does not challenge that TSOs' *searches* are for *violations of federal law*. Therefore, we assume that argument is waived. *See United States v. Frausto*, 636 F.3d 992, 997 (8th Cir. 2011).

-15-

The proviso does not use the phrase traditional law enforcement to modify officers of the United States Government. Instead, it uses the phrase "*investigative* or law enforcement officers." *Id.* (emphasis added). Certainly, the language used contemplates traditional law enforcement officers in various federal law enforcement agencies. But there is nothing in the language of the proviso to prevent TSOs from also being included as they perform their specialized searches to ensure public safety and national security. The proviso itself expressly defines the officers whose acts can cause injuries that are actionable irrespective of sovereign immunity. That definition is not narrow but broad as it includes "*any* officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* (emphasis added). TSOs search persons and baggage for weapons and explosives which might be transported by plane in violation of federal law. *See, e.g.*, 49 U.S.C. § 46505 (providing criminal penalties for "[c]arrying a weapon or explosive on an aircraft"). Whether traditional or not, these officers fall into the class of "investigative or law enforcement officers." 28 U.S.C. § 2680(h).

The government also argues that legislative history[4] indicates that Congress intended the proviso to refer to traditional law enforcement personnel. "In the usual case, if the statute's language is plain, the sole function of the courts is to enforce it according to its terms, without reference to its legislative history." *Owner-Operator Indep. Drivers Ass'n v. Supervalu, Inc.*, 651 F.3d 857, 863 (8th Cir. 2011) (cleaned up). We decline to resort to legislative history to interpret the proviso. It is not ambiguous.

---

[4]The government points out that the proviso was enacted in response to certain abusive police actions. *See* Appellee's Br. at 15 (citing S. Rep. No. 93-588, at 8 (Nov. 29, 1973), *as reprinted in* 1974 U.S.C.C.A.N. 2789, 2791). That may be true, but the language Congress ultimately enacted suggests a broader context. And per that language, the need to compensate citizens for injuries caused by certain acts of the government's officers would obtain in airports as well as other locales.

The dissent views our reading as inconsistent with the "general rule that ambiguity in waivers of sovereign immunity are construed in favor of the government." *See infra.* But as the *Pellegrino* majority indicated, the Supreme Court has held that conflicts "in the FTCA context" "do[] not implicate the general rule that a waiver of the Government's sovereign immunity will be strictly construed . . . in favor of the sovereign." *Dolan*, 546 U.S. at 491–92 (internal quotation omitted); *see also Pellegrino*, 937 F.3d at 171–72. In *Millbrook*, the Court further counseled against "a cramped reading of the proviso." *Pellegrino*, 937 F.3d at 172 (citing *Millbrook*, 569 U.S. at 56–57 ("declin[ing] to read . . . a limitation" of the law enforcement proviso's waiver of sovereign immunity "into unambiguous text")). In light of *Millbrook* and *Dolan*, two of our sister circuits have adopted similarly broad interpretations of the law enforcement proviso. *See id.*; *Bunch v. United States*, 880 F.3d 938, 944–45 (7th Cir. 2018). Our analysis here is consistent with the Supreme Court's instructions and our sister circuits' interpretations.

The dissent also believes that we should construe the proviso in the government's favor because it is an exception to the exception. *See Foster v. United States*, 522 F.3d 1071, 1079 (9th Cir. 2008) ("We interpret not an exception to the FTCA's waiver of sovereign immunity, but instead interpret an exception to the exception."). But as discussed above, the Court's language in *Dolan* is broad; it does direct application of strict construction "in the FTCA context." 546 U.S. at 492. Whether analyzing an exception or an exception to the exception, we are within the FTCA context, and therefore the rule does not apply.[5]

---

[5]In *LaFromboise v. Leavitt*, a panel of this court noted, even in light of *Dolan*, that "the scope of waivers of sovereign immunity must be strictly construed." 439 F.3d 792, 795 (8th Cir. 2006). However, that panel was not interpreting the proviso and said that its statement was "not necessary to our conclusion." *Id.* The language is dicta and thus nonbinding. *See Boaz v. United States*, 884 F.3d 808, 810–11 (8th Cir. 2018).

Thus, given the powers delegated to TSOs and the highly intrusive search techniques they are authorized to use, we find that they fall within the ordinary public meaning of the proviso's definition of *investigative or law enforcement officers.* 28 U.S.C. § 2680(h). In enacting the proviso, Congress waived sovereign immunity for actions arising out of battery claims committed by such officers. Therefore, we hold that sovereign immunity does not bar Iverson's battery claim. In addition, because the battery claim is not barred, Iverson's negligence claim is not barred, regardless of whether it "aris[es] out of" his battery claim. *See id.* (stating that the proviso applies to "any claim arising . . . out of . . . battery").

### III. *Conclusion*

For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

GRUENDER, Circuit Judge, dissenting.

Today, the court decides that Transportation Security Administration ("TSA") screening employees are "investigative or law enforcement officers of the United States Government" as defined in the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2680(h). In so doing, the court expands federal tort liability, relinquishing the sovereign immunity of the United States without a clear statement from Congress authorizing such a waiver. Because I do not believe this interpretation is consistent with the text, history, or structure of the FTCA, I respectfully dissent.

### I.

The FTCA waives the United States' immunity for certain torts committed by its employees. 28 U.S.C. § 1346(b)(1). This waiver of sovereign immunity is limited by a number of exceptions, including the "intentional tort exception,"

which preserves the United States' immunity from suit for—as the nickname implies—intentional torts committed by government employees. *See id.* § 2860(h). "In 1974, Congress carved out an exception to § 2680(h)'s preservation of the United States' sovereign immunity," adding what is known as the "law enforcement proviso." *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (citing Act of Mar. 16, 1974, Pub. L. No. 93-253, § 2, 88 Stat. 50)). This rewaiver of sovereign immunity provides federal district courts with exclusive jurisdiction over claims arising from a limited list of intentional torts committed by "investigative or law enforcement officers," § 2680(h), which Congress, in turn, defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," *id.*

We are tasked in this case with determining whether the law enforcement proviso extends to include TSA security screening employees. "[W]e normally construe [a statute] in accord with [the] ordinary and natural meaning" of its terms. *United States v. Jungers*, 702 F.3d 1066, 1071 (8th Cir. 2013). In so doing, we consider "the whole statutory text," *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006), analyzing its individual terms for relationships between one another that create and affect meaning, *see Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 643 (2006) ("[W]e do not read statutes in little bites."). As a result, though a word's meaning will "[o]rdinarily" "accord[] with its dictionary definition," *Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 (8th Cir. 2018), "[t]he definition[s] of words in isolation . . . [are] not necessarily controlling in statutory construction," *Dolan*, 546 U.S. at 486. Instead, as faithful interpreters of a statute written by Congress, we do not read the text without context. *See Bostock v. Clayton Cty.*, 590 U.S. ---, 140 S. Ct. 1731, 1825 (2020) (Kavanaugh J., dissenting) ("[C]ourts must adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase."); *Neal v. Clark*, 95 U.S. 704, 708-09 (1877) (confirming that the "meaning of a word" must be "ascertained by reference" to "the context" surrounding it).

The ordinary use of the English language makes the good sense of this rule apparent. If I said, "I saw her *duck*," the meaning of my words would vary greatly based on whether I finished the sentence by describing an object that had just been hurled across the room or if instead I explained that I had recently visited a friend's aviary. For this reason, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Acknowledging this maxim both of ordinary language and statutory interpretation, the court wisely notes that "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan*, 546 U.S. at 486.

Yet while the court and I agree on these settled principles, we disagree on how to apply them to the text at hand. In my view, the court errs in choosing the broadest possible definition of statutory terms while analyzing them without context—both that which exists within the four corners of the statutory text and the public meaning of the terms at the time the statute was enacted. *See Smith v. United States*, 508 U.S. 223, 241 (1993) (Scalia, J., dissenting) ("[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."); *see also* Frank. H. Easterbrook, *Foreword* to A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* xxv (2012) (noting that "[w]ords don't have intrinsic meanings" and "the significance of an expression depends on how the interpretive community alive at the time of the text's adoption understood those words").

The court thus commits the same error Judge Krause recognized in her well-reasoned dissent from the Third Circuit's *en banc* decision in *Pellegrino v. U.S. Trans. Sec. Admin.*, 937 F.3d 164, 181 (3d Cir. 2019) (en banc): it "dissects" the statute and then "recasts" it. By the end of the opinion, instead of finding that TSA screeners are "officer[s] of the United States empowered by law to execute

-20-

searches . . . for violations of Federal law," the court determines it is good enough that they "serve in positions of . . . authority" and have "legal power" to conduct "screenings" to "ensure public safety." Respectfully, I do not agree with this approach, and as a result, I do not agree that TSA screeners are "investigative or law enforcement officers" as defined by the FTCA. In my view, the ordinary meaning of the statute is that which nearly every other court has given it. *See Corbett v. Trans. Sec. Admin.*, 568 F. App'x 690, 700 (11th Cir. 2014) (per curiam) (collecting cases).

## II.

### A. TSA screeners are not "officer[s] of the United States."

Start with the phrase "officer of the United States." The court adopts the broadest reading of the relevant statutory terms, relying solely on its chosen dictionary definitions of "officer" to conclude that the law enforcement proviso covers TSA screeners. This approach is particularly problematic in this instance because Congress specifically distinguished between *employees* and *officers* in the FTCA and because it identified TSA screeners not as *officers* but as *employees* in the relevant authorizing statute.

The FTCA draws a clear distinction between employees on the one hand and officers on the other. For instance, the FTCA waives sovereign immunity for torts "caused by the negligent or wrongful act or omission of any *employee*." 28 U.S.C. § 1346(b)(1) (emphasis added). It does the same for "[a]ny claim based upon . . . a discretionary function or duty on the part of . . . *an employee* of the Government. *Id.* § 2680(a) (emphasis added). But Congress made a different choice when writing the law enforcement proviso: it did not waive sovereign immunity for the intentional torts of federal *employees* but instead granted federal district courts jurisdiction over certain intentional torts committed by an "*officer* of the United States." *Id.* § 2680(h) (emphasis added). The distinction signals a

-21-

clear difference—one which courts are tasked to define. *See Ctr. for Special Needs Tr. Admin., Inc. v. Olson*, 676 F.3d 688, 701-02 (8th Cir. 2012) (explaining that when Congress uses "particular language" in one section of a statute but different terminology in another, we "generally presume[]" Congress intended a difference in meaning).

Because § 2680(h) does not further define what it means by "officer of the United States," we have previously consulted an agency's authorizing statute to determine whether the person holding the position is an "officer." *Celestine v. United States*, 841 F.2d 851, 852-53 (8th Cir. 1988) (per curiam) (holding that Veterans' Administration hospital security guards are covered by the proviso because they were statutorily defined by 38 U.S.C. § 218 (1987) as "VA police officers" who were "empowered to make arrests for violation of federal law"). As the *Pellegrino* dissent noted, the FTCA specifically points to the particular "law" that "empower[s]" employees of that agency. 937 F.3d at 192 (Krause, J., dissenting) (quoting 28 U.S.C. § 2680(h)); *see also* 28 U.S.C. § 2671 (defining "[e]mployee of the government" for purposes of the FTCA as "officers or employees *of any federal agency*" (emphasis added)).

The relevant empowering law—here, the Airport Transportation Security Act ("ATSA")—directs that security "screening . . . shall be carried out by a Federal Government *employee*." 49 U.S.C. § 44901(a) (emphasis added). And, like the FTCA, the ATSA draws a clear distinction between types of TSA personnel:  it creates both TSA employees and TSA officers. *Compare id.* (screening employees), *with id.* § 114(p)(1) (law enforcement officers). The ATSA then assigns the screening duties to the TSA *employees*. *Id.* § 44901(a). But the TSA Administrator may assign particular employees to serve as law enforcement *officers*, and they may carry firearms, make arrests, and seek and execute warrants for arrest or seizure of evidence. *Id.* §114(p)(1)-(2). Therefore, the very statutory scheme creating the TSA screening position classifies them as "employees" while excluding them from its classification of "officers."

The court "decline[s] the invitation" to follow Congress's clear directive. *Supra* at 8. It concedes that Congress described TSA screeners as employees in the ATSA, but it counters that Congress also defined employees in the ATSA to *include* officers. *See* 49 U.S.C. § 44901(a) (defining "employee" by reference to 5 U.S.C. § 2105). But the court should not be troubled by a sensible point: all officers are employees, but not all employees are officers. Helpfully, in this instance, Congress has told us which is which. For example, the ATSA tasks the TSA Administrator with "develop[ing] standards for the hiring and retention" of security screening employees, 49 U.S.C. § 114(e)(2), but grants the Administrator the power to "designate an employee . . . to serve as a law enforcement officer," *id.* § 114(p). Further, the TSA Administrator is required to "order the deployment of at least 1 law enforcement officer at each airport security screening location." *Id.* § 44901(h)(2). Thus, screening employees not "designate[d]" as officers are not officers, even though some personnel stationed at an airport screening location are officers. As a result, conflating "officer" with "employee" risks running afoul of the "usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (internal quotation marks omitted); *see also* Scalia & Garner, *Reading Law* 170 ("[A] material variation in terms suggests a variation in meaning.").

The court rejects the ATSA's clear distinction for two other reasons. First, in its view, adopting the ATSA's definition of TSA screeners as employees would impermissibly rewrite the FTCA. *Supra* at 9. And second, the court concludes that Congress's decision to label screeners as "employees" and other TSA officials as "officers" should not affect our reading of the FTCA because the statutes are not *in pari materia* and thus we are under no obligation to construe them "as if they were one law." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006); *supra* at 9-10.

-23-

Neither of these assertions is correct, and for the same reason. The Supreme Court has held that the law enforcement proviso "focuses on the *status* of persons whose conduct may be actionable." *Millbrook*, 569 U.S. at 56. As a result, "[t]he plain text confirms that Congress intended immunity determinations to depend on a federal officer's legal authority." *Id.* Accordingly, the FTCA directs courts to look to the agency's implementing statute to determine whether an individual is an employee or an officer. *See Metz v. United States*, 788 F.2d 1528, 1532 (11th Cir. 1986) (holding that the law enforcement proviso "cannot be expanded to include governmental actors who procure law enforcement actions, but who are themselves not law enforcement officers"). As explained above, the FTCA directs courts to examine the particular "law" that "empower[s]" employees of the relevant agency. *See* 28 U.S.C. § 2680(h); *id.* § 2671.

In this instance, Congress did more than use the same labels in different statutes. It specifically defined the authority of the relevant positions, determining that *employees* could do no more than conduct routine, consensual administrative screenings, while *officers* were empowered by law to conduct traditional law enforcement functions: execute searches, seize evidence, and make arrests. *See Corbett*, 568 F. App'x at 701 (explaining that the statutory scheme indicates there are within the TSA "(1) federal employees, who conduct airport security screening; and (2) law enforcement officers, who perform various law enforcement functions"). We need not look very far for reasons why Congress might choose to waive immunity for the actions of those vested with discretion to carry out traditional law enforcement functions while retaining immunity for the actions of mere employees. *See O'Connor v. Ortega*, 480 U.S. 709, 724 (1987) (explaining that investigative and law enforcement officers "are expected to 'schoo[l] themselves in the niceties'" of the Fourth Amendment's doctrinal restrictions) (alteration in original) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 343 (1985)).[6]

---

[6]In a footnote, the court appears to suggest that it is relevant that TSA screeners wear uniforms and have badges. *Supra* at 6 & n.2. But we are tasked with

Instead of relying on the statutory distinction drawn in the ATSA, the court relies on dictionary definitions of "officer" that it selected. For example, it notes that *Black's Law Dictionary* defines "officer" as "[o]ne who is invested with some portion of the functions of the government to be exercised for the public benefit." *Supra* at 6. It also directs us to *Webster's* definition that an officer is one "charged with a duty" or one who "serve[s] in a position of trust, authority or command esp. as specif. provided for by law." *Id.* at 5. But it is not clear why one should choose any of the definitions offered by the court, especially when others—more approximate to the ordinary meaning of "officer" when situated in context—exist. For instance, the same version of *Webster's* cited by the court also defines

---

determining whether the TSA screeners are *statutorily* authorized as "officer[s] of the United States." The uniforms prescribed by TSA regulations cannot change the law Congress has written. *See Metz*, 788 F.2d at 1532. Tellingly, the news report the court cites in support for its finding that TSA screeners are officers begins: "Screeners at the nation's airport checkpoints are going to start wearing police-style badges—but *real officers* aren't too happy about it." Thomas Frank, *TSA's New Policelike Badges a Sore Point with Real Cops*, ABC News (June 23, 2008), https://abcnews.go.com/Travel/story?id=5173231&page=1 (emphasis added)).

Appearances aside, there are real differences between TSA screeners and officers, in terms of not only their statutory authorization but also their training. TSA screeners are required to "possess a high school diploma" or experience "sufficient" to satisfy the Administrator they can "perform the duties of the position." 49 C.F.R. § 44935(f). They must also have "basic aptitudes and physical abilities, including color perception, visual and aural acuity, physical coordination, and motor skills," as well as "sufficient dexterity and capability" to "manipulate and handle such baggage, containers, and other objects subject to security processing." *Id.* On the other hand, TSA law enforcement officers are required to undergo the standard law enforcement training required by the state in which they work, a program that must include training in firearms and "treatment of persons subject to inspection, detention, search, arrest, and other aviation security activities." *Id.* § 1542.217(c). For this reason, in the very job description for screeners, it explains that while they carry out an important duty in service of the nation, "[t]his position is not a law enforcement position." *Transportation Security Officer (TSO)*, USAJOBS, https://www.usajobs.gov/GetJob/ViewDetails/466395100.

"officer" as "one charged with administering and maintaining the law (as a constable, bailiff, [or] sheriff)." Webster's Third New Int'l Dictionary 1567 (1971). *Webster's New Collegiate Dictionary* defines "officer" as simply "one charged with police duties." Webster's New Collegiate Dictionary 791 (1979).

In the face of a clear textual distinction drawn by Congress, and without any guidance to what definition is preferred, a judge's choice of dictionary should not be dispositive. *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (noting that the word "under" "has many dictionary definitions and must draw its meaning from its context"); *see also* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994) ("[T]he choice among meanings [of words in statutes] must have a footing more solid than a dictionary . . . ."). "Because common words typically have more than one meaning, [courts] must use the context in which a given word appears to determine its aptest, most likely sense." Scalia & Garner, *Reading Law* 418.

Ironically, the court's chosen definitions of "officer" suggest the court should look to the terms used in the ATSA. In the exact same definition, *Black's* explains that "[a]n 'officer' is distinguished from an 'employee' in the greater importance, dignity, and independence of his position," *Officer*, Black's Law Dictionary 1235 (4th ed. 1968), and that "[i]n determining whether one *is* an 'officer' or 'employee,'" we should look to how the position is "defined by the statute or ordinance creating it" or "whether it is created by an appointment or election, or merely by a contract of employment," *id.* (emphasis added). *Webster's Third New International Dictionary*, cited by the court, clarifies at the end of its definition not only that an officer is one "as specif. provided for by law" but also that *officer* is "distinguished from *employee*." Webster's Third New Int'l Dictionary 1567 (1971) (emphasis in original). Yet the court dismisses the statutory distinctions drawn between the same terms both in the FTCA and in the TSA's authorizing statute.

As Justice Scalia once explained, "the good textualist is not a literalist." A. Scalia, *A Matter of Interpretation: Federal Courts and the Law* 24 (1997). Because TSA screeners are specifically deemed "employees" and not "officers" in the relevant authorizing statute, they are not "officer[s] of the United States" as defined in the FTCA.

### B. TSA screeners are not "empowered by law to execute searches . . . for violations of Federal law."

Even if I were to agree that TSA screeners are "officer[s] of the United States," I still would not find that they are "investigative or law enforcement officers" as defined in the law enforcement proviso because TSA screeners are not "empowered by law to execute searches . . . for violations of Federal law."[7]  28 U.S.C. § 2680(h).

The court concludes that TSA screening personnel are "empowered by law" to conduct searches for violations of federal law because they are authorized to conduct "the screening of all passengers and property," 49 U.S.C. § 44901(a), and screening, in turn, is defined in part as a "physical examination," including a "physical search," *id.* § 44901(g)(4).  The court thus finds that TSA screenings satisfy the "plain meaning" of the word "search," *supra* at 12, drawing from *Black's Law Dictionary* and defining "search" as "[a]n examination of a man's . . . person, with a view to the discovery of contraband or illicit or stolen property."

_____

[7]Iverson does not argue that TSA screeners are empowered to seize evidence or make arrests, and for obvious reasons.  The relevant provisions of the ATSA specify that screeners do not have the power to perform these functions.  The section of the Act that establishes the powers and responsibilities of the TSA has separate provisions for "screening operations" and "law enforcement powers." *See* 49 U.S.C. § 114(e), (p).  The TSA Administrator has the power to designate a "law enforcement officer" with ability to "make an arrest without a warrant" and "seek and execute warrants for arrest or seizure of evidence . . . upon probable cause that a violation has been committed." *Id.* § 114(p)(1)-(2).  TSA screeners lack the powers given to TSA law enforcement officers. *See id.* § 44901(g)(4).

But the court omits a key clause from its chosen definition. The same edition of *Black's* continues beyond the court's excerpted section, defining "search" as "[a]n examination of a man's . . . person, with a view to the discovery of contraband or illicit or stolen property *or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense*." Black's Law Dictionary 1518 (4th ed. 1968) (emphasis added). The court's omission is telling. It neglects the investigative context of its chosen definition of search just as it neglects a key distinction between two types of searches: investigative and administrative.

As other courts have acknowledged, search is "a legal term of art," *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 578 (6th Cir. 2005), and sometimes a "search is not a search" in the relevant sense of the word, *Kyllo v. United States*, 533 U.S. 27, 32 (2001). When Congress passed the law enforcement proviso in 1974, "execute searches" primarily referred to criminal law enforcement searches (otherwise known as investigative searches) executed by traditional law enforcement officers. The Supreme Court did not recognize the concept of administrative searches until 1967, *compare Camara v. Municipal Ct. of City & Cty. of San Francisco*, 387 U.S. 523 (1967), *with Frank v. Maryland*, 359 U.S. 360 (1959); *see also* 5 Wayne R. LaFave, *Search and Seizure* § 10.1 (5th ed. 2012), and, as a result, the term "search" had barely begun to be used in reference to examinations for noncriminal law enforcement purposes, *see Administrative Search*, Black's Law Dictionary (11th ed. 2019) (citing an origin date of 1960). Consistent with the complete version of the court's chosen contemporaneous definition of search, *see* Black's Law Dictionary 1518 (4th ed. 1968), the FTCA waives sovereign immunity for intentional torts committed by officers empowered to execute investigative searches, not administrative searches, *see EEOC v. First Nat'l Bank of Jackson*, 614 F.2d 1004, 1007-08 (5th Cir. 1980) (holding that EEOC agents authorized to copy evidence during inspection were not given authority to "execute searches" as contemplated in § 2680(h)).

Supporting the Government's contention, the *Pellegrino* dissent emphasized that at least four textual cues in the law enforcement proviso suggest that Congress only referred to criminal or investigative searches: the word preceding searches ("execute"); the terms to be defined ("investigative or law enforcement officer"); the other responsibilities listed ("seize evidence" and "make arrests"); and the series qualifier ("for violations of Federal law"). *See* 937 F.3d at 185. I agree. Taken together, the surrounding context for the term "searches" makes clear that the statute refers solely to traditional criminal or investigative searches. *See Gutierrez v. Ada*, 528 U.S. 250, 254-55 (2000) (interpreting words in a statute consistently with their neighbors to avoid giving unintended breadth to an Act of Congress).

First, Congress did not simply use the term "search" alone but instead defined the relevant officials as those with the power to "execute searches." When Congress uses the phrase "execute searches," it "invariably refers to traditional investigatory searches." *Pellegrino*, 937 F.3d at 185 (Krause, J., dissenting) (citing 18 U.S.C. § 2231(a); *id.* § 2234; *id.* § 3109; 22 U.S.C. § 2709(a)(2)). And prior to the enactment of the proviso in 1974, neither the Supreme Court nor any circuit court had ever used the phrase outside of the investigative search context. *See, e.g.*, *Chimel v. California*, 395 U.S. 752, 756 (1969); *Wong Sun v. United States*, 371 U.S. 471, 482 (1963); *Ker v. State of Cal.*, 374 U.S. 23, 38 (1963); *Ng Pui Yu v. United States*, 352 F.2d 626, 628 (9th Cir. 1965); *United States v. Hurse*, 453 F.2d 128, 129 (8th Cir. 1971). On the other hand, when granting authority to conduct administrative searches, Congress has generally employed very different language. *See Pellegrino*, 937 F.3d at 185 (Krause, J., dissenting). As Judge Krause explained, *see id.*, for instance, the TSA is authorized to carry out "screening[s]," 49 U.S.C. § 44901(a), while OSHA, FDA, and EPA employees "inspect," 29 U.S.C. § 657(a)(2) (OSHA); 21 U.S.C. § 374(a)(1) (FDA); 42 U.S.C. § 6927(a) (EPA).

"[I]t is a cardinal rule of statutory construction that, when Congress employs a [legal] term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (internal quotation marks omitted). Put another way, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Hall v. Hall*, 584 U.S. ---, 138 S. Ct. 1118, 1128 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

Here, Congress chose to use the term "execute searches," a phrasing it has employed repeatedly and consistently to the same effect. We are thus bound to give it the same meaning. *Finley v. United States*, 490 U.S. 545, 556 (1989), *abrogated on other grounds by* 28 U.S.C. § 1367 (noting that it "is of paramount importance . . . that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts").

Second, the term "execute searches" logically draws meaning from the terms it defines: *investigative or law enforcement officer*. "[T]he meaning of [a] definition is almost always closely related to the ordinary meaning of the word being defined." Scalia & Garner, *Reading Law* 228; *id* at 232 ("[T]he word being defined is the most significant element of the definition's context."). Put a bit more bluntly: "It should take the strongest evidence to make us believe that Congress has defined a term in a manner repugnant to its ordinary and traditional sense." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 719 (1995) (Scalia, J., dissenting).

Here, it is beyond contention that the phrase "investigative or law enforcement officer" evokes criminal law enforcement. *See Law Enforcement*, Black's Law Dictionary (11 ed. 2019) ("The detection and punishment of violations of the law."); *Investigative Search*, Black's Law Dictionary (11 ed. 2019) ("A search, esp. a police search, . . . for the purpose of cataloguing the items

. . . ."); *see also* Henry Campbell Black, *Handbook on the Construction and Interpretation of the Laws* 171 (2d ed. 1911) ("The words of a statute are to be construed with reference to its subject-matter.").  As Judge Krause explained when discussing the same issue, "the only other statutes found in the United States Code that employ analogous terminology are the Wiretap Act, 18 U.S.C. §§ 2510-2522, 3121-3127, which Congress enacted six years before the law enforcement proviso, and the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1809, 1827, which was enacted four years afterward." *Pellegrino*, 937 F.3d at 188 (Krause, J., dissenting).  Both statutes discuss the authority of certain officers to conduct investigations relevant to criminal law enforcement.  *Id.*  For this reason, courts have almost uniformly determined that the proviso covers positions that "participate[] in traditional law enforcement" while excluding those "positions that lack a criminal law component."  *See id.* at 198-99 (Krause, J., dissenting) (collecting cases).

Third, § 2680(h) pairs "execute searches" with other traditional law enforcement functions, "seiz[ing] evidence" and "mak[ing] arrests."  The rule of *noscitur a sociis*—that a word is known by the company it keeps—is intended to prevent courts from heedlessly assigning one word an expansive meaning such that it gives "unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  Here, these three functions are regularly used to refer to the powers of law enforcement. *See* 21 U.S.C. § 878; *United States v. Rabinowitz*, 339 U.S. 56, 61 (1950) (explaining that law enforcement officers may "*search* the place where the *arrest* is made in order to find and *seize* things connected with the *crime*" (emphasis added)).  Thus*,* the Government contends, under the canon of *noscitur a sociis*, the criminal law enforcement connotation attached to seizing evidence and making arrests should attach to executing searches too, limiting the reach of the terms. *See Dolan*, 546 U.S. at 486; *Weinraub v. United States*, 927 F. Supp. 2d 258, 263 (E.D.N.C. 2012) ("[I]t would be unreasonable to interpret 'to execute searches' to include the TSA screener's performance of narrowly focused, consensual searches that are administrative in

nature, when considered in light of the other traditional law enforcement functions (i.e., seizure of evidence and arrest) that Congress chose to define 'investigative or law enforcement officers.'").

The court dismisses the invocation of the canon of *noscitur a sociis* in this case, reasoning (1) that the term "searches" is clear and (2) that the three duties in the proviso are listed in the disjunctive and thus application of the canon is inappropriate. *Supra* at 14. I respectfully disagree with the court's view of when the canon is appropriate.

In *Dolan*, a case the court repeatedly cites, the Supreme Court invoked *noscitur* to hold that another provision in the FTCA that bars claims arising out of the "loss, miscarriage, *or* negligent transmission of letters or postal matter" did not include slip-and-fall hazards created by mail carriers because the words "negligent transmission" were necessarily limited by the words "loss" and "miscarriage." *Dolan*, 546 U.S. at 486 (emphasis added). As in *Dolan*, so too here. The term "execute searches" is necessarily limited by the words "seize evidence" and "make arrests." The use of the disjunctive *or* does not change this fact. *See* Scalia & Garner, *Reading Law* 196-97 (discussing approvingly the invocation of *noscitur a sociis* to define the term "case" in the phrase "fastened case, gunbox, *or* securely tied package" (emphasis added)).[8]

At any rate, there is another reason why one should not adopt the court's reading of the law enforcement proviso. Each function in the law enforcement proviso is connected at the end of the sentence by the phrase "for violations of Federal law," a postpositive modifier (sometimes called a series qualifier) that

---

[8]Indeed, there may just as well be times where the conjunctive *and* is a misleading signal for when the canon is applicable. *See* Scalia & Garner, *Reading Law* 196 (noting that words must be "conjoined in such a way as to indicate that they have some quality in common" and that, as a result, the "walrus's allusion to 'shoes and ships and sealing-wax, . . . cabbages and kings' provides no occasion for *noscitur a sociis*" (quoting Lewis Carroll, *Through the Looking Glass* 64 (1871; repr. 1917))).

affects the meaning of each term. *See* Scalia & Garner, *Reading Law* 147. Reading the phrase "execute searches" to exclude the terms "for violations of Federal law" would result in one meaning when modifying "make arrests" (criminal only) and another when modifying "execute searches" (criminal and noncriminal). That is not how we traditionally read statutes. *See Gutierrez*, 528 U.S. at 255 (noting that it would be "odd" to think Congress "suddenly" changed the meaning of a phrase "midway through a statute"); *United States v. Bass*, 404 U.S. 336, 339-40 (1971) (applying the series-qualifier canon).

The court sidesteps this problem by stating that the United States did not argue TSA screeners do not execute searches for violations of federal law. *Supra* at 15 n.3. It thus assumes the screenings TSA personnel conduct must be for violations of federal law. But the Government argues that TSA screeners do not "execute searches" at all, which means, *a fortiori*, that they are not executing searches for violations of federal law. Moreover, the Government repeatedly asserts that, even if the screening actions taken by TSA employees constitute "searches" in the literal sense of the word, TSA screeners do not "execute searches" in the manner described by the FTCA because they serve a different programmatic purpose. That is, again, they are not searches for violations of law, because as "[s]everal courts have concluded," "TSA screeners perform consensual, pre-boarding administrative searches for certain prohibited items (i.e., knives, firearms, liquids, gels, etc.), not traditional law enforcement functions such as making arrests and executing searches for violations of federal law." *Corbett*, 568 F. App'x at 700 (collecting cases); *see also United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005) ("Airport screenings of passengers and their baggage constitute administrative searches . . . ."). Even Iverson admits that such "searches would seemingly not satisfy § 2680(h)'s requirement that an official be 'empowered by law to execute searches.'" *Cf. Wilson v. United States*, 959 F.2d 12, 15 (2d Cir. 1992) (determining that parole officers with the power to "seize evidence" are not "investigative or law enforcement officers" because the seizure "depends on the consent of the person from whom the evidence is to be taken").

Indeed, to suggest otherwise is to put the entire TSA screening program in constitutional doubt, *see Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001) (holding that to be constitutional, a suspicionless search must advance an interest "divorced from the State's general interest in law enforcement"), and we have repeatedly held that such readings are disfavored when another construction is possible, *see, e.g.*, *Saxton v. Fed. Hous. Fin. Agency*, 901 F.3d 954 (8th Cir. 2018).

Because of this constitutional requirement, the TSA's authorizing statute makes clear that TSA screeners are to screen only for "cargo [that] poses a threat to transportation security." 49 U.S.C. § 44901(a)(4). While TSA seeks to uncover firearms, explosive devices, and other items prohibited on aircraft under threat of criminal penalty, *id.* § 46505, they search "for the programmatic purpose of removing prohibited items, which is designed to prevent 'violations of Federal law' from occurring," *Pellegrino*, 937 F.3d. at 187 (Krause, J., dissenting).

Accordingly, "[s]creeners do not have the authority to detain individuals and must *call law enforcement officers* to search, seize, and arrest individuals if illegal items are found." *Welch v. Huntleigh USA Corp.*, No. 04-663 KI, 2005 WL 1864296 at *5 (D. Or. Aug. 4, 2005) (emphasis added); *see also Pellegrino*, 937 F.3d at 184 (Krause, J., dissenting) (citing the TSA's own regulations and explaining that if a screener discovers evidence of a crime, he must "refer it to a supervisor or law enforcement official for appropriate action"); *Walcott v. United States*, No. 13-CV-3303, 2013 WL 5708044 at *2 (E.D.N.Y. Oct. 18, 2013) (making similar point and holding that TSA screeners do not "execute searches" under § 2680(h)). Contrary to the court's suggestion today, the administrative nature of such inspections does not change simply because TSA screeners "discover evidence of crimes." *See New York v. Burger*, 482 U.S. 691, 716 (1987). Therefore, TSA agents "do not search, and may not constitutionally search, 'for violations of Federal law.'" *Pellegrino*, 937 F.3d at 187 (Krause, J., dissenting).

For similar reasons, the ATSA does not vest TSA screeners with the same discretion to execute searches as it vests in officers. *See supra* at 12. TSA screeners cannot choose whom to screen or what to look for. Instead, at the direction of the TSA Administrator, they must "screen[] *all* passengers and property," they must do so "before boarding," and they must follow the "methods" specified by statute or the TSA Administrator. *See* 49 U.S.C. § 44901(a), (g)(4) (emphasis added). By contrast, TSA officers may "make an arrest . . . for *any* offense against the United States . . . or for *any* felony cognizable under the laws of the United States," and they are empowered with discretion to "seek and execute warrants" whenever they have "probable cause that a violation has been committed." *Id.* § 114(p)(2)(B)-(C) (emphasis added). In fact, it is in part precisely because screeners lack this discretion that the first courts to consider the constitutionality of airport screenings determined that they were constitutional. *See, e.g.*, *United States v. Davis*, 482 F.2d 893, 910 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007); 5 LaFave, *Search and Seizure* § 10.6(c) (reviewing cases).

In context, then, it is clear that the FTCA waives sovereign immunity only for intentional torts committed by officers who execute searches for violations of federal criminal law. As a result, TSA screeners are not investigative or law enforcement officers.

*C. Ambiguity in waivers of sovereign immunity are to be narrowly construed in favor of the United States*

There is yet another reason why, respectfully, I cannot adopt the court's reading of the law enforcement proviso: we generally require a "clear statement" to find a waiver of sovereign immunity, and we apply a general rule that ambiguity in waivers of sovereign immunity are construed in favor of the Government. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *Lane v.*

-35-

*Peña*, 518 U.S. 187, 192 (1996) ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."). If anything, the closeness of this issue dictates that TSA screeners are not "investigative or law enforcement officers" as defined by the FTCA. *See Cooper*, 566 U.S. 290-91.

In light of this well-established principle, the breadth of its chosen definitions of "officer," particularly when coupled with its definition of "search," should give the court pause. First, the court defines the term "officer" as "one charged with a duty" who "serve[s] in a position of trust, authority, or command." *Supra* at 5. On its face, that broad definition is elastic enough to cover almost all federal employees, suggesting it likely is not what the term "officer" means in the statutory context of a limited waiver of sovereign immunity concerning intentional torts of "investigative or law enforcement officers." And second, because its definition of "search" is equally broad, the court significantly expands federal tort liability, seemingly covering all intentional torts of all federal employees who conduct administrative searches, investigations, or inspections, without distinction. *See Millbrook*, 569 U.S. at 57 (holding that the United States is liable for the intentional torts committed by an investigative or law enforcement officer even when the officer is not carrying out the law enforcement proviso's statutorily prescribed duties).

With the court's broad construction in hand, future litigants will be hard-pressed to distinguish between TSA screeners and other federal employees that perform screenings at the entrances of government buildings or any other administrative search for that matter. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 39 (2000); 41 C.F.R. § 102-74.370 (authorizing all federal agencies to, "at their discretion, inspect packages, briefcases and other containers in the immediate possession of . . . persons arriving on, working at, visiting, or departing from Federal property"); *see also Pellegrino*, 937 F.3d at 196-97 (Krause, J., dissenting) (describing the numerous government employees that conduct

administrative, programmatic, or security screenings). Justice Scalia once vividly counselled that "[Congress] does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Disregarding this rule of construction, the court's reading of the FTCA smuggles a very large pachyderm into the statute.[9]

I am mindful that the Supreme Court has counseled that courts must be cautious when interpreting *exceptions* to the FTCA's waiver of sovereign immunity so as not to defeat the purpose of the statute, *Dolan*, 546 U.S. at 491-92, but as the Ninth Circuit has noted, in the context of the law enforcement proviso, "[w]e interpret not an exception to the FTCA's waiver of sovereign immunity, but instead interpret an exception to the exception," *Foster v. United States*, 522 F.3d 1071, 1079 (9th Cir. 2008). That is, "our task is to interpret a waiver of sovereign immunity." *Id.*; *see Millbrook*, 569 U.S. at 52-53 (noting that the law enforcement proviso "extends the waiver of sovereign immunity"). The rule that we "strictly construe[]" "the scope of waivers of sovereign immunity" thus still applies. *See LaFromboise v. Leavitt*, 439 F.3d 792, 795 (8th Cir. 2006) (noting that this rule remains applicable in the FTCA context generally even though *Dolan* suspends its application when "interpreting the scope of exceptions to the government's waiver of immunity under the FTCA").[10] Therefore, we must resolve any doubts about the scope of the law enforcement proviso in favor of the United States. *Cooper*, 566 U.S. at 290-91 (holding that where "a plausible interpretation of the statute" exists that would preserve the United States' sovereign immunity, a court must adopt it). Given that the Eleventh Circuit, a Third Circuit panel, and at least four district courts have found that TSA screeners *are not* "investigative or law

---

[9]On their own, the approximately 50,000 TSA screeners screen approximately two million passengers each day. Factsheet, *TSA by the Numbers*, Trans. Sec. Admin 1 (Feb. 4, 2020), https://www.tsa.gov/sites/default/files/resources/tsabythenumbers _factsheet.pdf.

[10]Even if *LaFromboise*'s discussion of this issue is "dicta and thus nonbinding," *supra* at 17 n.5, as discussed below, it is correct.

enforcement officers," *see Pellegrino v. U.S. Trans. Sec. Admin.*, 896 F.3d 207 (3d Cir. 2018); *Corbett*, 568 F. App'x at 700 (collecting cases), I do not believe one can conclude that the United States has *clearly* waived immunity from suit for the intentional torts of government employees who conduct routine administrative screenings.

The court points out, *supra* at 17, that the *Pellegrino en banc* majority read *Dolan* to mean that "disputes over the breadth of the Tort Claims Act 'do[] not implicate the general rule that a waiver of the Government's sovereign immunity will be strictly construed . . . in favor of the sovereign,'" *Pellegrino*, 937 F.3d at 171 (quoting *Dolan*, 546 U.S. at 491). Notably, however, the *Pellegrino en banc* majority misread *Dolan* for the same reason it misread the proviso: it lifted language out of the surrounding context and recast it. The immediate context in *Dolan* makes clear the Court was discussing only the exceptions to the FTCA's waiver of sovereign immunity, as it found "this principle" of strict construction "unhelpful" "where unduly generous interpretations *of the exceptions* run the risk of defeating the central purpose of the statute." *Dolan*, 546 U.S. at 491-92 (emphasis added and internal quotation marks and citation omitted). *Pellegrino* thus overread *Dolan* by treating it as carving out interpretation of the *waivers* of sovereign immunity in the FTCA from the general rule that such waivers are strictly construed in favor of the United States. Unsurprisingly, the majority of our sister circuits still apply the strict-construction rule to waivers of sovereign immunity in the FTCA, *Dolan* notwithstanding. *See, e.g.*, *Cooke v. United States*, 918 F.3d 77, 82 (2d Cir. 2019); *Hajdusek v. United States*, 895 F.3d 146, 151 (1st Cir. 2018); *Wood v. United States*, 845 F.3d 123, 127 (4th Cir. 2017); *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016); *Burton v. United States*, 559 F. App'x 780, 781 (10th Cir. 2014); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 855 (9th Cir. 2011); *Ramos v. U.S. Dep't of Health & Human Servs.*, 429 F. App'x 947, 950 (11th Cir. 2011) (per curiam).

*Millbrook* is not to the contrary; it is entirely inapposite. *Millbrook* did not discuss—let alone reject—the applicability of the strict-construction rule to the FTCA generally. *See* 569 U.S. at 51-57. As a result, I would not read the opinion as creating *sub silentio* an idiosyncratic carveout to two centuries of precedent recognizing generally that waivers of sovereign immunity are strictly construed in favor of the Government. *See Price v. United States*, 174 U.S. 373, 375-76 (1899); Scalia & Garner, *Reading Law* 281-89 (explaining history of sovereign immunity). *Millbrook* simply found, with respect to a different issue involving the law enforcement proviso, that the proviso was "unambiguous." *See* 569 U.S. at 57. *Millbrook* thus stands for the unremarkable proposition that "the canon favoring strict construction of waivers of sovereign immunity" must "give way" when the words of a statute are unambiguous. *See Sebelius v. Cloer*, 569 U.S. 369, 380-81 (2013). Notably, the issue before us now was not before the Court in *Millbrook*. *See* 569 U.S. at 55 n.3 ("The Government conceded in the proceedings below . . . that the named correctional officers qualify as 'investigative or law enforcements officers' within the meaning of the FTCA. Accordingly, we express no opinion on . . . th[is] issue[]." (citations omitted)).[11]

Finally, regardless of whether the general rule that waivers of sovereign immunity are to be strictly construed applies in the FTCA context, I do not believe

---

[11]If one needed additional evidence that *Millbrook* did not abrogate the strict-construction rule as applied to waivers in the FTCA, one only needs to consider who authored the opinion. Justice Thomas dissented in *Dolan*, arguing among other things that the Court should strictly construe the FTCA's exceptions in favor of the Government. *See* 546 U.S. at 498 (Thomas, J., dissenting). It is therefore somewhat curious to construe *Millbrook*, authored by Justice Thomas and written just a few years after *Dolan*, *see Millbrook*, 569 U.S. at 51, as rejecting (without analysis or explanation) the strict-construction rule's applicability to the FTCA *in toto*. The better view, reading both *Dolan* and *Millbrook* together, is that (1) *Dolan* requires different interpretive rules for the FTCA's exceptions than for its waivers, and (2) *Millbrook* had no occasion to invoke an otherwise permissible interpretive rule to construe the law enforcement proviso because it found the proviso unambiguous regarding the issue before it.

the court is empowered to give the FTCA's terms "an expansive meaning." *Supra* at 7. Indeed, I am aware of no case that suggests waivers of sovereign immunity should be construed *broadly against* the Government. Instead, *Dolan*, to the extent it applies, directs courts to identify "those circumstances which are within the words and reason of the exception—no less and no more." 546 U.S. at 492 (internal quotation marks omitted).

Here, because TSA screeners are not "investigative or law enforcement officers" as defined by the FTCA—that is, they are not "within the words and reason" of any waiver of immunity—I respectfully dissent.

_____