UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
2022 MSPB 26

Docket No. DC-1221-19-0677-W-1

**Peggy A. Maloney,**

**Appellant,**

**v.**

**Executive Office of the President, Office of Administration,**

**Agency.**

August 3, 2022

Peggy A. Maloney, Alexandria, Virginia, pro se.

Raheemah Abdulaleem, Washington, D.C., for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

**OPINION AND ORDER**

¶1      The appellant petitions for review of the initial decision that dismissed her individual right of action (IRA) appeal for lack of jurisdiction.  For the following reasons, we GRANT the petition for review, VACATE the initial decision, and REMAND the appeal for further adjudication consistent with this Opinion and Order.

BACKGROUND

¶2      The appellant, a GS-11 Management Analyst with the Office of Administration (OA), an entity within the Executive Office of the President

(EOP), filed this IRA appeal alleging that, in reprisal for whistleblowing disclosures, the agency took numerous actions against her, including placing her on administrative leave, issuing a letter of reprimand, placing her on a work improvement plan, denying her a within-grade increase (WIGI), and proposing her suspension.[1]   Initial Appeal File (IAF), Tab 1 at 1, 6-19, Tabs 5-6, Tab 11 at 19.   The agency moved to dismiss the appeal for lack of jurisdiction asserting, among other things, that it was not an "agency" under 5 U.S.C. §§ 1221(a), 2302(a)(2)(A), (b)(8), over which the Board has jurisdiction in an IRA appeal. IAF, Tab 8 at 14-21.   The appellant filed a response to the agency's motion to dismiss, in which she addressed this issue.   IAF, Tab 14 at 14-17.

¶3        Based on the written record, the administrative judge dismissed the appeal, finding that the Board lacks jurisdiction over IRA appeals filed by OA employees in EOP.[2]   IAF, Tab 19, Initial Decision (ID) at 1, 5-8.   She reasoned that, under

---

[1] The appellant also filed and had automatically refiled Board appeals challenging her subsequent separation from employment. *Maloney v. Executive Office of the President, Office of Administration*, MSPB Docket No. DC-0752-20-0092-I-1; *Maloney v. Executive Office of the President, Office of Administration*, MSPB Docket No. DC-0752-20-0092-I-2.   Those cases will be adjudicated by the Board in separate decisions.   The appellant also has filed a request for regulation review, the disposition of which does not impact our decision here.   *See Maloney v. Office of Personnel Management*, MSPB Docket No. CB-1205-21-0005-U-1.   Therefore, that request will be separately adjudicated.

[2] Although not raised by the parties on review, the agency asserted below that the appeal was untimely filed because it was not filed within the 60-day deadline set forth at 5 U.S.C. § 1214(a)(3)(A).   IAF, Tab 8 at 21-23.   The administrative judge found the appellant timely filed the appeal, but provided no reasoning in support of that conclusion.   We agree that the appeal was timely filed.   Section 1214(a)(3)(A) of title 5 provides that an IRA appeal must be filed no more than 60 days after "notification was provided" that the Office of Special Counsel (OSC) terminated its investigation of the appellant's complaint.   The statutory language does not specify whether the 60-day period begins to run from the date of the Special Counsel's notice or the date of the whistleblower's receipt of that notice.   Practices and Procedures for Appeal and Stay Requests of Personnel Actions Allegedly Based on Whistleblowing, 62 Fed. Reg. 59992-01, 59992 (Nov. 6, 1997).   Under the Board's implementing regulations clarifying that issue, an IRA appeal must generally be filed no later than 65 days after

the applicable statute, only employees in a covered position in an "agency" may seek corrective action from the Board, and that EOP was not an "agency." *Id.* The administrative judge also noted that, although the appellant asserted that the agency denied her a WIGI, "there is no record that the appellant filed an appeal of that action." ID at 4 n.2.

¶4      The appellant has filed a petition for review of the initial decision, and the agency has filed a response thereto. Petition for Review (PFR) File, Tabs 1-2, 4, 13.[3] The appellant has filed a reply to the agency's response to her petition for review. PFR File, Tab 14.[4]

---

the date OSC issued its close-out letter or, if the letter is received more than 5 days after its issuance, within 60 days of the date of receipt. 5 C.F.R. § 1209.5(a)(1); *e.g.*, *Heimberger v. Department of Commerce*, 121 M.S.P.R. 10, ¶ 6 (2014). If the 65th day falls on a weekend or holiday, the filing period automatically is extended to the next work day. *Pry v. Department of the Navy*, 59 M.S.P.R. 440, 442-43 (1993); 5 C.F.R. § 1201.23. Here, the 65th day after OSC emailed its May 9, 2019 letter advising the appellant of her right to file an IRA appeal with the Board was Saturday, July 13, 2019. IAF, Tab 11 at 6-7. Thus, she timely filed her appeal on the next workday, which was July 15, 2019. IAF, Tab 1.

[3] Because the appellant's arguments at Tabs 1 and 4 of the Petition for Review File are identical, we have cited only to where those arguments appear at Tab 1 for the sake of clarity. For the same reason, to the extent the appellant repeats the same arguments in Petition for Review File, Tab 2, we have cited only to where those arguments appear in Tab 1.

[4] The appellant has filed several motions for leave to submit additional pleadings in which she raises "objection[s]" and "concerns" that address arguments already mentioned in her petition for review, such as the administrative judge's decision to sever her appeals and failure to issue a decision within 120 days. PFR File, Tabs 10, 20; *see* 5 C.F.R. § 1201.114(a)(5) (providing that no pleading other than those described in 5 C.F.R. § 1201.114(a) will be accepted unless the Clerk of the Board grants the party's motion to do so). She also raises new claims such as an alleged criminal conspiracy. PFR File, Tab 10. Once the record closes on review, no additional evidence or argument will be accepted unless it is new and material and was not readily available before the record closed. 5 C.F.R. § 1201.114(k). We deny the appellant's motions because she has not met these requirements. *See Durr v. Department of Veterans Affairs*, 119 M.S.P.R. 195, ¶ 23 (2013) (denying an appellant's request to submit a document containing information that he failed to show was unavailable despite his due diligence before the record closed on review).

ANALYSIS

Our focus in this case is primarily on whether OA, rather than EOP as a whole, is subject to the Board's IRA jurisdiction.

¶5        It is not clear whether the administrative judge based her jurisdictional determination on a finding that OA was not an "agency," or on a determination that the entire EOP was not an "agency." *Compare* ID at 5 ("The Board lacks jurisdiction over IRA appeals from employees in the Office of Administration in the Executive Office of the President."), 8 ("There is no evidence or argument to establish that OA, EOP is covered under the definition of an 'executive agency.'"), *with* ID at 5-6 (finding that EOP was not an executive department or a Government corporation, and stating that "[t]his case turns on whether EOP is an 'independent establishment' in the executive branch"). Because of the unique nature of EOP as a collection of "offices and entities that directly support the work of the President of the United States . . . courts have routinely examined whether individual components within the EOP qualify as 'independent establishments' or as 'agencies,' rather than examining the EOP's status as a whole." *Argus Secure Technology, LLC*, B-419422, B-419422.2, 2021 WL 694804, *6 (Comp. Gen. Feb. 22, 2021) (citing *Kissinger v. Reporters Commission for Freedom of the Press*, 445 U.S. 136, 156 (1980) (determining that "the President's immediate personal staff or units in the [EOP] whose sole function is to advise and assist the President" are not agencies subject to the Freedom of Information Act (FOIA), even though EOP is expressly included in the definition of an "agency" under FOIA (citations omitted))); *Citizens for Responsibility & Ethics in Washington v. Office of Administration*, 566 F.3d 219, 223-24 (D.C. Cir. 2009) (*CREW*) (reviewing which units within EOP the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit) had found were, and which it had found were not, agencies subject to FOIA); *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998) (recognizing that the D.C. Circuit has declined to consider EOP as a whole to be an agency under FOIA); *Electronic Privacy*

*Information Center v. Presidential Advisory Commission on Election Integrity*, 266 F. Supp. 3d 297, 315-18 (D.D.C. 2017) (declining to deem EOP as a whole a "parent agency" subject to the Administrative Procedures Act; instead, examining the functions of the EOP entity at issue, the Director of White House Information Technology, and concluding it was not an agency).[5] Thus, our review focuses on the specific EOP organization that took the actions at issue here, which was OA.

The central issue in this appeal is whether OA is an independent establishment within the meaning of 5 U.S.C. § 104(1).

¶6      An "employee . . . may, with respect to any personnel action taken, or proposed to be taken, against such employee . . . as a result of a prohibited personnel practice described in [5 U.S.C. § 2302(b)(8), 2302(b)(9)(A)(i), (B), (C), or (D)], seek corrective action from the [Board]" by filing an IRA appeal. 5 U.S.C. § 1221(a).  A "personnel action," in turn, means one of a number of listed employment actions "with respect to an employee in . . . a covered position in an agency."  5 U.S.C. § 2302(a)(2)(A).  Therefore, the Board's jurisdiction in an IRA appeal is dependent, in part, on whether an "agency" took the alleged personnel action or actions.[6]  *See O'Brien v. Office of Independent Counsel*, 74 M.S.P.R. 192, 199 (1997).

---

[5] The Board may consider decisions by Federal district courts, and opinions of the Comptrollers General and the Attorneys General, as persuasive guidance, but not as binding authority.  *Walker v. Department of the Army*, 104 M.S.P.R. 96, ¶ 11 n.2 (2006) (finding that the Board may follow district court decisions it finds persuasive); *Special Counsel v. DeMeo*, 77 M.S.P.R. 158, 172 (1997) (finding that the Board may consider decisions of the Comptrollers General and Attorney General as persuasive, but not binding, authority), *aff'd per curiam*, 230 F.3d 1372 (Fed. Cir. 1999) (Table).  We find that, for purposes of our determination to focus primarily on OA, the reasoning of *Argus Secure Technology* and the various courts cited above is persuasive in this case.

[6] This jurisdictional requirement is absent from chapter 75 of title 5.  The only requirements for the Board's chapter 75 jurisdiction generally are that a tenured employee suffered an appealable adverse action.  *Moncada v. Executive Office of the President, Office of Administration*, 2022 MSPB 25, ¶¶ 13, 24.  With exceptions not relevant to our discussion here, the Board's jurisdiction over a chapter 75 appeal is not

¶7        An "agency" for purposes of an IRA appeal is defined as an "Executive agency" and the Government Publishing Office, but does not include certain intelligence and counterintelligence entities and the Government Accountability Office (GAO).        5 U.S.C. § 2302(a)(2)(C).        Section 2302 does not define "Executive agency."    In defining that term in IRA appeals, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) and the Board have generally relied on 5 U.S.C. § 105.  *See, e.g.*, *Booker v. Merit Systems Protection Board*, 982 F.2d 517, 519 (Fed. Cir. 1992); *Wilcox v. International Boundary & Water Commission*, 103 M.S.P.R. 73, ¶ 8 (2006); *O'Brien*, 74 M.S.P.R. at 199; *Pessa v. Smithsonian Institution*, 60 M.S.P.R. 421, 425 (1994).  The appellant states in her petition for review that the administrative judge "denies section 105 of title 5 is applicable in this case."    PFR File, Tab 2 at 13.    She is mistaken.    The administrative judge properly cited to, and relied on, 5 U.S.C. § 105.  ID at 5-6 & n.3.

¶8        Section 105 of title 5 defines an "Executive agency" as "an Executive department, a Government corporation, and an independent establishment." Sections 101 through 105 of title 5 were enacted together.  Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378, 378-79 (codified as amended, in pertinent part, at 5 U.S.C. §§ 101-105).    Therefore, we read them together as part of a harmonious whole.  2A Shambie Singer & Norman Singer, Sutherland Statutes & Statutory Construction § 46:5 (7th ed. 2021).  The Executive departments are

---

dependent on whether the entity that took the action was an "agency" because the relevant statutory language does not contain such a requirement.    5 U.S.C. §§ 7511(a)(1), 7512, 7513(d), 7701(a); *Moncada*, 2022 MSPB 25, ¶¶ 13-20, 24 & n.4. Because, as explained above, the Board only has IRA jurisdiction over an "agency," cases addressing the Board's chapter 75 jurisdiction over OA employees are not helpful for our analysis here.    Thus, to the extent that the appellant argues that we have jurisdiction over this appeal because the Board adjudicated the merits of her coworker's removal under chapter 75 in *Moncada*, and found it had jurisdiction over an OA employee's chapter 75 appeal in *Caveney v. Office of Administration*, 64 M.S.P.R. 169, 170, 172 (1994), PFR File, Tab 1 at 9-10, we find those cases to be inapposite.

listed in 5 U.S.C. § 101.  A Government corporation, according to 5 U.S.C. § 103, "means a corporation owned or controlled by the Government of the United States."  An "independent establishment," as relevant here, is defined as "an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment."[7]  5 U.S.C. § 104(1).

¶9        The administrative judge determined that OA is neither an Executive department, nor a Government corporation.  ID at 5-6.  The parties do not challenge this determination, and we discern no basis to disturb it.  As the administrative judge correctly observed, OA is not included in the list of Executive departments set forth at 5 U.S.C. § 101.  ID at 5.  Moreover, there is no indication that OA is a corporation owned or controlled by the Government of the United States.  ID at 5-6; *cf. Snead v. Pension Benefit Guaranty Corporation*, 74 M.S.P.R. 501, 503 (1997) (finding that Congress explicitly classified the Pension Benefit Guaranty Corporation as a wholly owned Government corporation).  Therefore, to be an Executive agency within the jurisdiction of the Board in this IRA appeal, OA must meet the definition of "independent establishment."

OA is an "independent establishment."

¶10       There are no Board or Federal court cases directly addressing whether OA is an "independent establishment" within the meaning of 5 U.S.C. § 104.  Therefore, the administrative judge looked to other statutes relating to OA and decisions that interpreted the terms "agency" or "independent establishment" as used in other statutes.  ID at 6-8.  The appellant disputes the applicability of these

---

[7] The definition expressly excludes the U.S. Postal Service and the Postal Regulatory Commission, and expressly includes GAO.  5 U.S.C. § 104.  Because these entities are not before us here, we will not discuss them further.

statutes and cases to this IRA appeal.  PFR File, Tab 1 at 10-11.  In order to address her arguments, we look first to the language of section 104.

        *The meaning of "independent establishment."*

¶11        The interpretation of a statute begins with the language of the statute itself. *Graves v. Department of Veterans Affairs*, 123 M.S.P.R. 434, ¶ 13 (2016).  As set forth above, an "independent establishment" is defined as "an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment."  5 U.S.C. § 104(1).  This definition does not clarify what is meant by an "establishment."[8]  Instead, section 104 defines "independent establishment" primarily in terms of what it excludes.  OA is clearly not an Executive department, military department, or Government corporation, or part thereof.  We find that OA also is not "part of an independent establishment."  Rather, it is part of EOP, which as set forth more fully below, itself can be viewed as not an independent establishment for purposes of this appeal.

---

[8] The heading of section 104 is entitled, "[i]ndependent establishment," but the text of that provision does not suggest that any additional element of "independence" is required to meet the definition, other than the requirements set forth in the text.  In other words, the statutory text contemplates that, so long as an establishment is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment, the establishment is "independent."  Although the title and headings of a statute may be "permissible" indicators of meaning, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1928 (2021), and can aid in resolving an ambiguity in the legislation's text, *I.N.S. v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991), as the Supreme Court explained in *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.*, 331 U.S. 519, 528-29 (1947), a "wise rule" of statutory interpretation is "that the title of a statute and the heading of a section cannot limit the plain meaning of the text."  *See* 2A Sutherland Statutory Construction § 47.3(7th ed. 2021) ("The title cannot control a statute's plain words.").  As set forth below, we address whether OA meets the definition of "independent establishment" as set forth in the plain meaning of the text of section 104, which is clear.  We therefore need not separately address the meaning of the term "independent."

¶12        To the extent the statutory term "establishment" may be ambiguous, the legislative history of section 104 sheds little light on its meaning.  A Senate Report covering the enactment of section 104 merely provides that "[t]he section is supplied to avoid the necessity for defining 'independent establishment' each time it is used in this title," and that "[c]ertain agencies are not independent establishments under the definition since they are constituent agencies or parts of an independent establishment."  S. Rep. No. 89-1380, at 22 (1966).  However, the Senate Report specifies that "these agencies would continue to be subject to the provisions of this title applicable to the independent establishment of which they are a constituent or part."  *Id.*

¶13        In the absence of a statutory definition or clear guidance in the legislative history, the Board generally will interpret words as taking their ordinary, contemporary, common meaning.  *Weed v. Social Security Administration*, 107 M.S.P.R. 142, ¶ 6 (2007).  In determining that meaning, the Board may refer to dictionary definitions.  *Winns v. U.S. Postal Service*, 124 M.S.P.R. 113, ¶ 14 (2017), *aff'd sub nom. Williams v. Merit Systems Protection Board*, 892 F.3d 1156 (Fed. Cir. 2018).  Therefore, we do so here.

¶14        The ordinary meaning of the term "establishment" has remained essentially unchanged since the early 19th century.  An "establishment" is "[t]hat which is fixed or established; as a . . . local government, an agency, . . . etc."  *Establishment*, Webster's 1828 Dictionary; *see* Webster's 1993 Dictionary 778 (using similar terms such as "something that has been established," and providing as an example "a permanent civil or military force or organization").  As set forth below, a review of the historical background leading up to the creation of EOP and OA is helpful in ascertaining whether OA meets the above definition.

        *The history of EOP and OA.*

¶15        EOP first came into existence as a result of President Roosevelt's Reorganization Plan No. 1 of 1939, pt. 1, 4 Fed. Reg. 2727 (July 1, 1939), *as*

*reprinted in* 53 Stat. 1423 (1939); Harold C. Relyea, Congressional Research Service, 98-606 GOV, The Executive Office of the President: An Historical Overview 8 (2008) (Relyea). In his message to Congress accompanying the plan, President Roosevelt wrote that the plan reduced the number of agencies reporting directly to the President and gave the President "assistance in dealing with the entire executive branch by modern means of administrative management." Message of the President to the Congress of the United States Accompanying the Reorganization Plan No. 1 of 1939, *as reprinted in* 5 U.S.C. app. 1. Both in Reorganization Plan No. 1, and in a second reorganization plan issued the same year, Reorganization Plan No. 2 of 1939, the President transferred a number of functions and entities to EOP. Reorganization Plan No. 1 of 1939, §§ 1-4, 4 Fed. Reg. at 2727-28; Reorganization Plan No. 2 of 1939, § 301(a), 4 Fed. Reg. 2731, 2732 (July 1, 1939), *as reprinted in* 53 Stat. 1431. By joint resolution, Congress provided that both reorganization plans went into effect on July 1, 1939. S.J. Res. 138, 76th Cong., 53 Stat. 813 (1939) (enacted).

¶16 A few months later, the President issued an Executive Order organizing EOP by defining its functions and duties so as to provide the President with "adequate machinery for the administrative management of the Executive branch of the Government." Exec. Order No. 8248, 4 Fed. Reg. 3864 (Sept. 8, 1939). Since its creation, EOP has had a varying number of principal units within it. Relyea at 8-10 (2008). As it exists today, "[t]he function of the EOP is to support the work of the President . . . at the center of the executive branch of the federal government." *Argus Secure Technology, LLC*, 2021 WL 694804, *1.

¶17 President Jimmy Carter "established" OA in EOP by means of Reorganization Plan No. 1 of 1977, § 2, 42 Fed. Reg. 56,101 (July 15, 1977, as amended Sept. 15, 1977), *as reprinted in* 3 U.S.C. ch. 2, refs. & annot. In a message to Congress accompanying the plan, the President emphasized that "EOP exists to serve the President and should be structured to meet his needs," and that he desired to "[l]imit the EOP, wherever possible, to functions directly related to

the President's work." Message of the President Transmitting Reorganization Plan No. 1 of 1977 (July 15, 1977), *as reprinted in* 3 U.S.C. ch. 2, refs. & annot. He summarized the functions of EOP as including, for example, "[p]rovid[ing] day-to-day operational support (e.g., scheduling, appointments)," assisting with presidential communications, and managing his "decisionmaking processes efficiently and fairly." *Id.*

¶18    Reorganization Plan No. 1 of 1977 provided that OA shall "be headed by the President," have a Director "appointed by the President," and "provide components of [EOP] with such administrative services as the President shall from time to time direct." Reorganization Plan No. 1 of 1977, § 2, 42 Fed. Reg. 56,101. President Carter set forth additional information and direction regarding OA's responsibilities in Executive Order No. 12,028, 42 Fed. Reg. 62,895 (Dec. 12, 1977). Per the Executive Order, OA "shall provide common administrative support and services to all units within [EOP]," and "upon request, assist the White House Office in performing its role of providing . . . administrative services" to the President. Executive Order No. 12,028, § 3(a), 42 Fed. Reg. at 62,895. Further, OA's common administrative support and services "shall encompass all types of administrative support and services that may be used by, or useful to, units within [EOP]," including personnel management services, equal employment opportunity programs, financial management services, data processing, library services, records, information services, and mail services. Executive Order No. 12,028, § 3(b), 42 Fed. Reg. at 62,895. The Director of OA shall, among other things, "do all other things that the President, as head of [OA], might do." Executive Order No. 12,028, § 4(a)(4), 42 Fed. Reg. at 62,896. Thus, OA is an extension of, and provides support to, the President. It also supports EOP, which reports directly to, and serves as an extension of, the President.

*OA meets the definition of "independent establishment."*

¶19      As discussed above, the meaning of the word establishment" has remained virtually unchanged throughout this period. An "establishment" could be a permanent civil, military, public, or private institution. *Establishment*, Webster's 1828 Dictionary; *see* Webster's 1993 Dictionary 778. OA is an establishment within the meaning of this definition. EOP was created in 1939, and since OA was "established" in 1977 by means of Reorganization Plan No. 1 of 1977, it has been a civil organization within EOP. *See Pessa*, 60 M.S.P.R. at 425 (finding the Smithsonian Institution to be an "independent establishment" under 5 U.S.C. § 104 because the statute creating it identified it as an "establishment," and it was independent of any of the Executive departments). As examples of its permanency, it has subdivisions and a staff. IAF, Tab 2 at 87 (describing the appellant's position as within the Office of the Chief Financial Officer (CFO) within OA), Tab 9 at 123-24 (establishing a Staff Advisory Council within OA, which is designed to "provide a unified voice to the Director and chief officers to affect meaningful change on behalf of the OA workforce," and "serve as a bridge between staff and senior management"), 124 (listing five offices within OA), Tab 12 at 52, 57 (describing positions as existing within the White House Information Technology subdivision of OA and the CFO Office).

¶20      Moreover, OA is not "part of an independent establishment." 5 U.S.C. § 104(1). As set forth above, OA is integrated into EOP and subject to the President's control. The U.S. Government Manual's organizational chart does not include EOP on its list of independent establishments, but instead places it on the chart directly under the President and Vice President. Federal Register, The United States Government Manual, Organizational Chart (2021) https://www.usgovernmentmanual.gov (last visited Aug. 1, 2022); *see* 1 C.F.R. § 9.1 (requiring the Director of the Administrative Committee of the Federal Registrar to publish the U.S. Government Manual). As previously discussed,

EOP itself operates at the center of the Executive branch, serves the President's needs, and is limited, as much as possible, to supporting his work. *E.g.*, Message of the President Transmitting Reorganization Plan No. 1 of 1977 (July 15, 1977), *as reprinted in* 3 U.S.C. ch. 2, refs. & annot; *Argus Secure Technology,* 2021 WL 694804, *1.[9]

¶21    The appellant asserts on review that *Wilcox*, 103 M.S.P.R. 73, ¶¶ 8-10, supports a finding that OA is an "agency" for purposes of her IRA appeal. PFR File, Tab 2 at 20. In *Wilcox*, the Board found that the International Boundary and Water Commission (IBWC) was an "agency" for purposes of the appellant's IRA appeal because, among other things, IBWC employees were covered by various provisions of title 5 of the U.S. Code, such as the Federal Employees' Retirement System, the Federal Employees Group Life Insurance Program, the Federal Employees' Health Benefits Program, title 5 leave provisions, and the Fair Labor Standards Act, all of which the Board found either rely on the same definition of "agency" or apply to "executive agencies." *Id.*, ¶¶ 8-10. The Board found that "[t]hese are all indicia of Executive agency status." *Id.*, ¶ 9. While there appear to be some organizational differences between OA and IBWC, we agree with the appellant that *Wilcox* does provide some support for our determination in this case, given that the appellant is also covered by many of those same programs and statutes. IAF, Tab 12 at 51, 56.

¶22    Similarly, we find support for our determination in *O'Brien*, 74 M.S.P.R. at 200, 202. The Board found therein that the Office of Independent Counsel was an executive agency, and thus within the definition of "agency" for purposes of the Whistleblower Protection Act (WPA), primarily because of the lack of an

---

[9] Even assuming, however, that EOP were to be considered an "independent establishment," such a determination would not affect our determination in this case. As set forth above, *see supra* ¶ 12, OA would continue to be subject to the provisions of title 5 applicable to the independent establishment of which it is a constituent or part.

express statutory exclusion of that entity from 5 U.S.C. § 2302(a)(2)(C), as well as court and GAO determinations finding that it was within the Executive branch. The Board quoted from a GAO finding that independent counsels and their staff are governed by the same statutory provisions and regulations applicable to other executive branch officers and employees contained in title 5 of the U.S. Code relating to pay, allowances, travel, and transportation. *Id.* at 200.

¶23      More importantly, because the whistleblower statutes are remedial legislation, the Board will construe them liberally to embrace all cases fairly within their scope, so as to effectuate the purpose of those statutes. *Fishbein v. Department of Health & Human Services*, 102 M.S.P.R. 4, ¶ 8 (2006).   In this case, such a liberal construction includes 5 U.S.C. §§ 1221(a), 2302(a)(2)(A), and 2302(a)(2)(C), which together permit an employee in a covered position in an "agency" to seek corrective action from the Board.   The specific mention of certain things in a statute implies the exclusion of other things.   *See Graves*, 123 M.S.P.R. 434, ¶ 13.      Here, it is significant that, although 5 U.S.C. § 2302(a)(2)(C) specifically excludes certain Federal entities from the definition of "agency," including the Federal Bureau of Investigation, the Central Intelligence Agency, other entities involved in intelligence or counterintelligence activities, and the GAO, it does not identify OA as being so excluded. *See O'Brien*, 74 M.S.P.R. at 199 (holding that, when Congress excluded government entities from coverage of the breadth of Federal civil service protections, it has done so with specificity).   Thus, this failure to specifically exclude OA from section 2302(a)(2)(C) informs our interpretation of the term "Executive agency" in that section, especially given that the definition of "Executive agency" set forth at 5 U.S.C. § 105 is not specific to the whistleblower process. *See Jacobsen v. Department of Justice*, 101 M.S.P.R. 134, ¶ 7 (2006) (holding that specific statutory language aimed at a particular situation ordinarily controls over general statutory language).

¶24      In fact, the legislative history of the 1994 Amendments to the WPA indicates that Congress was dissatisfied with the Board's narrow interpretation of the statute that led to gaps in coverage. *O'Brien*, 74 M.S.P.R. at 208. In its discussion of the expansion of the definition of "agency" in 5 U.S.C. § 2302(a)(2)(C) to include a government corporation, the responsible House Committee warned against technically rigid criteria and directed that "government corporation" be broadly construed to cover the full range of federally-funded institutions "where the merit system may be relevant to defend the taxpayers' interest." H.R. Rep. No. 103-769, at 23 (1994). More significantly, the report provided as follows:

> H.R. 2970 expands merit system coverage to virtually the entire Federal workforce, including employees of the Department of Veterans' Affairs and of Government corporations. In addition to those agencies exempted under section 2302(c)(ii) and 2302(c)(iii) (the General Accounting Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the Defense Intelligence Agency, the National Security Agency, and upon Presidential determination, any Executive agency or unit thereof the principle function of which is the conduct of foreign intelligence or counterintelligence activities), the only employees not covered are those expected [sic] from the competitive service when they applied or took office; because of [the] position's confidential, policy-determining, policy-making, or policy-advocating character; or those excluded by the President based on the President's determination that it is necessary and warranted by conditions of good administration.

*Id.* at 10. Given the above language in the legislative history, our determination regarding OA adopts a broad construction of the terms "independent establishment" and "Executive agency" to help expand whistleblower protection coverage and make the merit systems more relevant to taxpayer interests.

¶25      Our interpretation of the applicable whistleblower statutes as not excluding the appellant from Board appeal rights is not only consistent with the legislative history of the Amendments, but is also consistent with OA's historical position on the appeal rights of its employees. The Presidential and Executive Office

Accountability Act (PEOAA), Pub. L. No. 104-331, 110 Stat. 4053 (1996) (codified at 3 U.S.C. §§ 401-471), expanded the rights of individuals employed at the EOP. The laws that became applicable to EOP employees under PEOAA included, among others, the Fair Labor Standards Act of 1938, title VII of the Civil Rights Act of 1964, various other statutes prohibiting discrimination, the Family and Medical Leave Act of 1993, and the Occupational Safety and Health Act of 1970. 3 U.S.C. § 402. PEOAA's failure to include the applicable whistleblower statutes of title 5 in the list suggests that Congress already considered certain EOP employees to be covered by those statutes, which predated PEOAA. In fact, in recommending the extension of these discrimination and labor protections to EOP employees, the House Report appeared to assume that the Board had jurisdiction over most EOP employees. *See* H.R. Rep. No. 104-820, at 40-42 (1996) (indicating that most EOP employees "are covered by Title 5 of the U.S. Code," and that "Title 5 [EOP] employees are already entitled to an administrative . . . hearing" before the Equal Employment Opportunity Commission or the Board), *as reprinted in* 1996 U.S.C.C.A.N. 4348, 4375-77.

¶26         The legislative history also includes testimony regarding H.R. 3452, the bill that became PEOAA, from Franklin S. Reeder, then-Director of OA. Mr. Reeder explained that, "[t]he vast majority of [EOP] employees—two thirds or more—are civil service employees covered by the same protections and rights as other career executive branch employees under Title 5 of the U.S. Code." Presidential and Executive Office Accountability Act:  Hearing on H.R. 3452 Before the Subcomm. on Gov't Mgmt., Info., & Tech. of the Comm. on Gov't Reform and Oversight, House of Representatives, 104th Cong. 152 (1996) (statement of Franklin S. Reeder, Director, Office of Administration, Executive Office of the President). He contrasted these employees with the remaining one third, employed "in the four offices closest to the President:  the White House Office,

Office of the Vice President, Office of Policy Development, and Executive Residence." As to these employees:

> By long tradition and express statutory authority, employees in these four offices have served at the pleasure of the President. As Congress mandated in the provisions of Title 3 of the United States Code, these employees are hired "without regard to any other provision of law regulating the employment or compensation of persons in the Government service . . . . This long tradition and express statutory authority flow from the structure of the federal government established by the United States Constitution. The unfettered ability of the President to choose his closest advisers—and to choose when to dismiss them—is a necessary outgrowth of the separation and balance of the branches of government established in the Constitution.

*Id.* at 152-53. In a footnote, Mr. Reeder added:

> The [OA] is also authorized by Title 3, but its employees are, by design, virtually all career civil servants hired under Title 5 authority. A small number of [OA] employees are Title 3 employees who serve at the will of the President, on the same standing as employees in the White House Office and the other three Title 3 offices. *See* 3 U.S.C. § 107(b)(1)(A). Accordingly, the Office of Administration is more properly treated as a "Title 5" agency for purposes of the applicability of employee workplace laws.

*Id.* at 152 n.1. In later proceedings held on the PEOAA bill, the idea of creating a new entity to review EOP employee claims was abandoned, with Representative Carolyn Maloney explaining that EOP "employees already have recourse to the Merit Systems Protection Board." 142 Cong. Rec. H12,283-02, H12,286 (daily ed. Oct. 4, 1996) (statement of Rep. Maloney).

¶27    In sum, because we find that OA is an independent establishment under 5 U.S.C. §§ 101, 103-104, it is also an Executive agency under 5 U.S.C. § 105, and therefore meets the definition of "agency" set forth at 5 U.S.C. § 2302(a)(2)(C).

<u>We decline to rely on decisions interpreting other statutes and concerning other agencies to determine whether OA is an independent establishment.</u>

¶28    We note that the agency and the administrative judge relied in part on *CREW*, 566 F.3d at 220, 222, a case in which the court found that OA was not an "agency" under FOIA, and therefore not covered by that statute. Although we have relied on *CREW* in our determination above that the agency at issue in this case is OA and not EOP, we otherwise find the *CREW* decision distinguishable and do not rely upon it as a touchstone for determining the status of the OA. The court in *CREW* noted that the term "agency" was defined for purposes of FOIA as, among other things, an "establishment in the executive branch of the Government (including the Executive Office of the President)." *Id.* at 222. The court determined that the issue in deciding whether an EOP unit was an "agency" subject to FOIA was whether the entity wielded substantial authority independently of the President. *Id.* In adopting this standard, the court cited *Kissinger*, 445 U.S. at 156, which relied on the legislative history of FOIA. *Id.* The court concluded that the OA was not an "agency" subject to FOIA because it did not wield substantial independent authority. *Id.* at 223-24. The statutes at issue in this case differ significantly from those in *CREW*. Moreover, as set forth above, there is scant legislative history for 5 U.S.C. § 104; thus, there is no basis for using the *CREW* test to determine the status of OA in this case.

¶29    The agency and the administrative judge also relied on 3 U.S.C. § 107(b)(1), which provides that the President is authorized to regulate the employment and compensation of certain OA employees without regard to other provisions of law. ID at 7-8. The administrative judge found that this statute supports a finding that OA is not an "agency" because "the President may exercise authority over employees of OA as he determines to be appropriate." ID at 8. However, section 107(b)(1) addresses the President's authority to appoint and fix the pay of not more than 10 OA employees at designated rates of basic pay "without regard to such other provisions of law as the President may specify

which regulate the employment and compensation of persons in the Government service." It does not suggest that all employees of OA are appointed under the authority of title 3 of the U.S. Code. In fact, as set forth above, most EOP employees are appointed under the authority of title 5 of the U.S. Code. Therefore, we are not persuaded that section 107(b)(1) provides a basis for making a determination as to whether OA is an "independent establishment" under 5 U.S.C. § 104.[10]

¶30        The administrative judge relied on *Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995), wherein the court addressed whether an employee of the Executive Residence of the White House could bring a title VII discrimination case under 29 U.S.C. § 2000e-16. ID at 6. The administrative judge noted that the court, in finding that the Executive Residence was not an "independent establishment," relied on 3 U.S.C. § 112, which the court held "distinguish[es]" the Executive Residence from independent establishments. ID at 6-7. Section 112 provides that "[t]he head of any department, agency, or independent establishment of the executive branch of the Government may detail, from time to time, employees of such department, agency, or establishment to the White House Office, the Executive Residence at the White House, the Office of the Vice President, the Domestic Policy Staff, and the Office of Administration." 3 U.S.C.

---

[10] The agency cites to Reorganization Plan No. 1 of 1977 in support of its contention that "by law, staff members of OA are appointed by the President himself (or his designee)." PFR File, Tab 13 at 16. However, section 2 of that reorganization plan, which establishes the OA in the EOP, only references the President's appointment of the Director of the OA, who shall serve as its chief administrative officer.

The agency also contends that the Board's website provides that PEOAA is the "only basis" for its jurisdiction over EOP employees, and only after certain procedural requirements have been met. PFR File, Tab 13 at 20-21. The agency has not shown that the Board is bound by informational statements included on its website to assist appellants with answers to common questions. In any event, the Board's website merely provides a brief description of PEOAA; it does not identify PEOAA as the *only* basis for Board jurisdiction over an appeal filed by an EOP employee.

§ 112. It provides that any such office to which an employee has been detailed shall reimburse the detailing department, agency, or establishment for the pay of each employee under certain circumstances. *Id.* Thus, *Haddon* held that because Congress distinguished the Executive Residence from independent establishments, this suggested that Congress did not regard the Executive Residence to be an independent establishment. *Haddon*, 43 F.3d at 1490. The administrative judge applied analogous reasoning to OA. ID at 6-7.[11]

¶31      However, we find that a provision in a statute like 3 U.S.C. § 112, relating to details involving certain entities within EOP, does not shed light on the intent of Congress regarding whistleblower protections in general, and whether an OA employee can file an IRA appeal in particular. In other words, although Congress may have intended that independent establishments be distinct from the OA for purposes of details—although section 112 could just as easily be read as simply setting forth a way of authorizing certain details without implying anything about the status of the sending and receiving entities—it does not shed light on the intent of Congress regarding whistleblower rights. Thus, we find that 3 U.S.C. § 112 and 5 U.S.C. § 104 are not in pari materia, and that section 112 is therefore not helpful in discerning the meaning of the term "independent establishment." *See Iverson v. United States*, 973 F.3d 843, 850 (8th Cir. 2020) (applying the statutory canon requiring that statutes be in pari materia ("on the same subject") before courts can construe them "as if they were one law," and finding that the Federal Tort Claims Act and the Air Transportation Security Act are not "on the

---

[11] The appellant contends that *Haddon* is distinguishable from this appeal because Mr. Haddon was appointed to his White House chef position under the authority of title 3 of the U.S. Code, while she was appointed to her position under the authority of title 5. PFR File, Tab 1 at 10-11. Given our determination that the reasoning in *Haddon* is otherwise not persuasive for purposes of this appeal, we need not address this argument.

same subject," and thus, "there is no reason to assume that Congress attached the same meanings to *employee* and *officer* in each.").

¶32 Moreover, any reliance on 3 U.S.C. § 112 in interpreting 5 U.S.C. § 104 has an unacceptable statutory effect. It uses a later enactment—3 U.S.C. § 112—to aid in the construction of an earlier enactment—5 U.S.C. § 104. In this regard, section 112 was enacted as part of Pub. L. No. 95-570, § 3(a), 92 Stat. 2449, on November 2, 1978. Section 104, by contrast, was enacted as part of Pub. L. No. 89-554, 80 Stat. 379, on September 6, 1966. Relying on section 112 in construing section 104, therefore, would require the Board to hold that Congress silently informed or altered a term's meaning in one statute by passing an unrelated statute over 10 years later, which would be contrary to general principles of statutory interpretation. *See Iverson*, 973 F.3d at 849-50.

The appellant is an "employee" in a "covered position."

¶33 Because the administrative judge did not address any other jurisdictional issues in this IRA appeal, we address some of them here. The right to file an IRA appeal derives from 5 U.S.C. § 1221(a), which provides a right to seek corrective action from the Board to "an employee, former employee, or applicant for employment." *Fishbein*, 102 M.S.P.R. 4, ¶ 11. To be an employee under section 1221(a), an individual must meet the definition of employee under 5 U.S.C. § 2105. *Id.*, ¶ 12. Under 5 U.S.C. § 2105(a), an "employee" is: (1) an officer and an individual who is appointed in the civil service by one of the types of individuals enumerated in the statute acting in their official capacity; (2) engaged in the performance of a Federal function under authority of law or an Executive act; and (3) subject to the supervision of an authorized official while engaged in the performance of the duties of his position. The "civil service" is defined as "all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed services." 5 U.S.C. § 2101(1). Based on the record, it appears that the appellant meets the definition of an employee. IAF, Tab 11 at 19, 59, Tab 12

at 43-52, 56-57. The agency does not assert otherwise. IAF, Tab 8; PFR File, Tab 13.

¶34    A "covered position" means, among other things, "any position in the competitive service," but does not include any position that is excepted from the competitive service because of its confidential, policy-determining, policy-making, or policy-advocating character, or that is excluded from the coverage of section 2302 by the President based on a determination by the President that it is necessary and warranted by conditions of good administration. 5 U.S.C. § 2302(a)(2)(B). The record reflects that the appellant occupied positions in the competitive service. IAF, Tab 11 at 19, 59, Tab 12 at 51-52, 56-57. There is no indication that her positions were excepted from the competitive service for a reason listed in 5 U.S.C. § 2302(a)(2)(B)(i) or excluded from coverage based on a determination by the President. *See Usharauli v. Department of Health & Human Services*, 116 M.S.P.R. 383, ¶ 18 (2011). The agency does not make such arguments in this case. IAF, Tab 8; PFR File, Tab 13. Thus, we find that the appellant's positions were "covered" under 5 U.S.C. § 2302(a)(2)(B).

The appellant's remaining arguments on review are without merit.

¶35    The appellant challenges the administrative judge's decision to sever this appeal from her appeal of her separation from employment. PFR File, Tab 1 at 5; *Maloney v. Office of Administration, Executive Office of the President*, MSPB Docket No. DC-0752-20-0092-I-1, Initial Appeal File, Tab 38. On October 30, 2019, the administrative judge joined this IRA appeal involving pre-separation personnel actions with the appellant's separation appeal. IAF, Tab 17. However, in her July 23, 2020 initial decision, the administrative judge stated that "the appeals were later severed." ID at 3 n.1.

¶36    An administrative judge may join cases if doing so would expedite processing of the cases and not adversely affect the interests of the parties. 5 C.F.R. § 1201.36(b). The decision whether to join two appeals is a matter

committed to the sound discretion of the administrative judge in accordance with the above guidance. *McCarthy v. International Boundary & Water Commission*, 116 M.S.P.R. 594, ¶ 10 (2011), *aff'd*, 497 F. App'x 4 (Fed. Cir. 2012). By extension, an administrative judge has the same discretion in severing appeals. The appellant has shown no abuse of discretion by the administrative judge in her determination to sever the appeals. *See Orr v. Department of the Treasury*, 83 M.S.P.R. 117, ¶ 6 n.2 (1999) (finding no abuse of discretion in the administrative judge's failure to grant joinder), *aff'd per curiam*, 232 F.3d 912 (Fed. Cir. 2000) (Table).

¶37      Additionally, the appellant appears to argue that she was not given sufficient notice to object to the administrative judge's decision to sever the appeals because she first learned of the severance in the initial decision.[12] PFR File, Tab 1 at 4-5. Assuming, without deciding, that the administrative judge erred in failing to provide prior notice, the appellant has failed to demonstrate how she was harmed. An administrative judge's procedural error is of no legal consequence unless it is shown to have adversely affected a party's substantive rights. *See Karapinka v. Department of Energy*, 6 M.S.P.R. 124, 127 (1981). The jurisdictional issue in the instant appeal is unaffected by its joinder with or severance from the appellant's appeal of her separation.

¶38      The appellant also appears to assert that the administrative judge decided to sever her appeals and dismiss the instant appeal after she complained to the

---

[12] The appellant similarly appears to assert that she received the email notification that her appeal was severed 48 hours after it was issued. PFR File, Tab 1 at 4-5, 14. She also asserts that the way in which her private email provider displayed emails in her inbox caused her to overlook some of the Board's emails. *Id.* at 14. Throughout this appeal, the appellant has been a registered e-filer. IAF, Tab 1 at 2. As such, she has an obligation to monitor case activity in the Board's e-Appeal Online system, and the initial decision is deemed to have been served on her on the date it was issued. 5 C.F.R. §§ 1201.14(j)(3), (m)(2). Her arguments regarding her receipt of automated email notifications from e-Appeal Online do not demonstrate any error by the administrative judge or the Board.

Department of Justice's Office of Professional Responsibility regarding the administrative judge's "intentional delay of Appellant's due process." PFR File, Tab 1 at 6, Tab 2 at 25-26. In making a claim of bias against an administrative judge, a party must overcome the presumption of honesty and integrity that accompanies administrative adjudicators. *Thompson v. Department of the Army*, 122 M.S.P.R. 372, ¶ 29 (2015). An administrative judge's conduct during the course of a proceeding warrants a new adjudication only if her comments or actions evidence a deep-seated favoritism or antagonism that would make fair judgment impossible. *Id.* We find that the appellant's allegations of bias do not meet this standard. The mere fact that the administrative judge ruled against a party does not establish bias. *Id.*

¶39     The appellant further contends that the administrative judge did not meet the Board's 120-day time limit for issuing an initial decision and incorrectly stated that the agency placed her on a performance improvement plan when it actually placed her on a work improvement plan.[13] PFR File, Tab 1 at 4, 8-9, 12.

---

[13] The appellant also appears to challenge the administrative judge's determination that she did not appeal the denial of a WIGI. PFR File, Tab 1 at 6. She cites to locations in the record purportedly reflecting that she raised two WIGI denials, one in July 2017, and another in July 2018, and appears to allege she was denied a third WIGI in 2019. *Id.* (citing IAF, Tab 1 at 9-10, Tab 14 at 7-8); IAF, Tab 11 at 37-38. Although the administrative judge acknowledged that the appellant raised a WIGI denial as an alleged personnel action in this IRA appeal, she observed that the appellant did not otherwise seek to appeal the denial. ID at 4 n.2. We discern no error by the administrative judge in this regard. When an appellant raises a claim that may fall within the Board's jurisdiction, the Board must provide explicit information on what is required to establish an appealable jurisdictional issue. *Burgess v. Merit Systems Protection Board*, 758 F.2d 641, 643-44 (Fed. Cir. 1985). The record contains no records of WIGI denials in 2018 or 2019. As to the July 2017 WIGI denial, the agency issued a final decision to withhold the appellant's WIGI on August 22, 2017, and notified her of her right to appeal that action to the Board within 30 days. IAF, Tab 11 at 28-29. The appellant filed the instant appeal approximately 11 months later. In her initial appeal, the appellant contested at least 30 alleged personnel actions since 2015, including two WIGI denials. IAF, Tab 1 at 7-10. Thus, read in context, we agree with the administrative judge that the appellant raised her WIGI denials as alleged personnel

These arguments are without merit. The Board's general practice is to issue an initial decision within 120 days of the filing of the appeal. *McCollum v. Department of Veterans Affairs*, 75 M.S.P.R. 449, 462 (1997). This time period is a yardstick that the Board relies on to evaluate its administrative judges and its rate of expeditiously processing appeals. *Milner v. Department of Justice*, 87 M.S.P.R. 660, ¶ 9 (2001). Although the administrative judge issued the initial decision 8 months beyond the 120-day standard, *compare* IAF, Tab 1 at 1, *with* ID at 1, the appellant has not shown that the administrative judge was biased against her or otherwise committed reversible error in this regard. *See McCollum*, 75 M.S.P.R. at 462; *Sanborn v. Department of the Navy*, 15 M.S.P.R. 553, 554 (1983). Further, the nomenclature used by the administrative judge to address the appellant's performance or work improvement plan is not relevant to the jurisdictional issue.

¶40    The appellant appears to reiterate a claim of sexual harassment that she raised below. PFR File, Tab 2 at 21-22, Tab 14 at 10-11; IAF, Tab 1 at 8, 14. This claim does not bring her appeal within the Board's IRA jurisdiction. Discrimination claims do not provide the Board with an independent source of jurisdiction. *Wooten v. Department of Veterans Affairs*, 102 M.S.P.R. 131, ¶ 11 (2006). Further, the Board lacks the authority to decide, in conjunction with an IRA appeal, the merits of an appellant's allegation of prohibited discrimination. *Newcastle v. Department of the Treasury*, 94 M.S.P.R. 242, ¶ 12 (2003). Therefore, the appellant's discrimination claim does not change the outcome in this appeal.

---

actions in this IRA appeal and not as otherwise appealable actions. To the extent that the appellant is now attempting to appeal the denials of WIGIs as separate matters under 5 U.S.C. § 5335(c), she may file a Board appeal challenging those actions. She will need to show that such an appeal is timely filed or that good cause exists for any delay in filing. *See Alonzo v. Department of the Air Force*, 4 M.S.P.R. 180, 184 (1980); 5 C.F.R. § 1201.22(b).

¶41    Finally, the appellant claims that: the administrative judge failed to rule on her request that he ask the Office of Special Counsel (OSC) for an injunction against EOP; she has new evidence concerning her health condition; and the agency's attorneys engaged in misconduct. PFR File, Tab 1 at 5, 12, Tab 2 at 24; IAF, Tab 1 at 14-15. Although the Board may rule on an appellant's request to stay an employing agency's personnel action, the appellant has not shown that she has met the criteria for the Board to seek a stay or injunction on her behalf. 5 C.F.R. §§ 1209.8-1209.10. The appellant's medical condition and any alleged misconduct by the agency's attorneys are not relevant to the jurisdictional issue, and do not warrant a different result in this case.

¶42    Having found that OA is an "agency" for purposes of an IRA appeal and that the appellant is an "employee" in a "covered position," the remaining jurisdictional questions in this case include whether the appellant has exhausted her remedy with OSC and made nonfrivolous allegations that she made a protected disclosure or engaged in protected activity that was a contributing factor in a personnel action. *See Graves*, 123 M.S.P.R. 434, ¶ 12. The administrative judge shall address these questions on remand. If the appellant establishes Board jurisdiction over this IRA appeal, the administrative judge shall adjudicate the merits of the appeal.

## <u>ORDER</u>

¶43      Accordingly, we remand this case for further adjudication consistent with this Opinion and Order, including the hearing the appellant requested.

FOR THE BOARD:

/s/ _____

Jennifer Everling
Acting Clerk of the Board
Washington, D.C.